**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**GALLIT FISCHMAN, Individually,**
  Plaintiff,

v.                              Civil Action No. _____

**BOSTON CHILDREN'S HOSPITAL,**
  Defendant.

## COMPLAINT FOR NEGLIGENCE, NEGLIGENT UNDERTAKING, AND WRONGFUL DEATH
(JURY TRIAL DEMANDED)

**NATURE OF THE ACTION**

1. This is a wrongful death and negligence action against Boston Children's Hospital ("BCH"), a major academic medical institution that contractually accepted primary regulatory oversight authority over the TEAMMATE clinical trial, a multi-site pediatric transplant study involving the immunosuppressant drug everolimus, manufactured by Novartis Pharmaceuticals.

2. BCH's primary oversight role is established not by inference but by admission. In a letter brief submitted to the Texas Attorney General by the University of Texas System's Office of General Counsel, UTSW's attorneys represented that "BCH's IRB has primary regulatory oversight of the trial at issue" and that the records at issue "consist of records prepared by, or at the direction of, Boston Children's Hospital's IRB and provided to the University's IRB." That brief further disclosed that UTSW was "relying upon BCH's IRB for the study protocol at issue pursuant to the SMART IRB Master Reliance Agreement" and confirmed that "University employees acted as investigators or support staff" in the trial. These representations were made by adverse counsel to a government authority and establish before any discovery that BCH held

primary regulatory oversight of the trial, that its authority was formalized in a signed reliance agreement, and that UTSW personnel participated as investigators or support staff. A true and correct copy of the University of Texas System letter brief to the Texas Attorney General dated August 20, 2025 is attached hereto as Exhibit A.

3. Plaintiff's father, Dov Fischman, was not enrolled in the TEAMMATE trial. He had been stable on an established immunosuppressive regimen for approximately nine years following his heart transplant. A physician who had recently joined the UTSW transplant program approached his care for the first time and recommended a transition to everolimus — a drug not FDA-approved for heart transplantation in any population. There was no documented therapeutic failure of his prior regimen. He subsequently developed post-transplant lymphoproliferative disorder (PTLD) and a serious infection — known risks associated with everolimus — and died in January 2025. Plaintiff alleges that BCH's institutional failures in overseeing the TEAMMATE trial contributed to the harm that followed.

## I. PARTIES

4. Plaintiff Gallit Fischman is an individual residing in Dallas County, Texas. She brings this action individually and as a statutory beneficiary of Dov Fischman, her father, who died in January 2025 following treatment with everolimus at UT Southwestern Medical Center in Dallas, Texas.

5. Defendant Boston Children's Hospital is a private nonprofit hospital and academic medical center located at 300 Longwood Avenue, Boston, Massachusetts 02115 and may be served at that address. BCH maintains an Institutional Review Board ("BCH IRB") as an internal committee created, funded, staffed, and operated by BCH to fulfill its federal obligations

regarding the ethical oversight of human-subjects research. The BCH IRB is not an independent legal entity; it is an instrumentality of BCH, and all acts and omissions of the BCH IRB alleged herein are acts and omissions of BCH itself.

6. At all relevant times, BCH, acting through its IRB and pursuant to the SMART IRB Master Reliance Agreement, served as the reviewing authority with primary regulatory oversight over the TEAMMATE clinical trial, as confirmed by UTSW's counsel in representations made to the Texas Attorney General described in Section IV.C below.

7. Publicly available descriptions of the TEAMMATE trial identify Stanford Children's Hospital and Boston Children's Hospital as institutions leading the study. The precise role played by Stanford Children's Hospital has not yet been determined. Plaintiff reserves the right to amend this Complaint pursuant to Federal Rule of Civil Procedure 15 to join Stanford or other responsible entities as additional defendants if discovery reveals they exercised relevant authority over the trial.

## II. JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is domiciled in Texas and Defendant is a Massachusetts institution. The amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff seeks damages exceeding $5,000,000 for wrongful death, loss of parental companionship, mental anguish, medical expenses, funeral expenses, and other damages recoverable under applicable law.

9. Venue is proper in this district under 28 U.S.C. § 1391(b)(1), as Defendant resides in this district. Venue is also proper under 28 U.S.C. § 1391(b)(2), given that a substantial part of the acts and omissions giving rise to the claims occurred within this district. Boston Children's

Hospital's institutional decisions approving the TEAMMATE protocol, consent materials, investigator oversight structure, and continuing review occurred in Massachusetts and constitute a substantial part of the events giving rise to Plaintiff's claims

## III. APPLICABLE LAW

10.  Massachusetts applies the "most significant relationship" approach to choice-of-law in tort cases. See *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631–32 (1985). BCH's institutional research oversight conduct — its approvals, continuing reviews, and oversight omissions — occurred in Massachusetts. Massachusetts tort law therefore governs Counts I and II.

11.  Massachusetts recognizes the doctrine of negligent undertaking under Restatement (Second) of Torts §§ 323 and 324A. A party who voluntarily assumes oversight or protective responsibilities is liable for physical harm resulting from failure to exercise reasonable care in that undertaking, particularly where that failure increases the risk of harm or where others rely on the undertaking. See *Mullins v. Pine Manor College*, 389 Mass. 47 (1983). Under Massachusetts law, federal regulations governing human-subjects research establish the applicable standard of care for an institution that has voluntarily undertaken primary IRB oversight of a federally regulated clinical trial. Plaintiff invokes the Common Rule (45 C.F.R. Part 46) and FDA regulations governing informed consent (21 C.F.R. Part 50) and IRB oversight (21 C.F.R. Part 56) as the standard of reasonable institutional conduct, not as independent sources of a private right of action. See *Thorson v. Mandell*, 402 Mass. 744, 750 (1988). State appellate courts have recognized that federal human-subjects research regulations can establish enforceable standards of care in state negligence actions against research institutions, and that the research relationship itself can give rise to duties of care extending from the institution to those foreseeably affected

Page 4

by the conduct of its research programs. See *Grimes v. Kennedy Krieger Inst., Inc.,* 782 A.2d 807, 858 (Md. 2001) (holding that "the very nature of nontherapeutic scientific research on human subjects can, and normally will, create special relationships out of which duties arise," and that federal regulations governing human-subjects research may be enforced through state negligence claims).

12. BCH's oversight obligations arose from its voluntary assumption of federally regulated responsibilities and constitute duties of reasonable institutional care once undertaken, which are not avoided through reliance on or delegation to participating sites.

13. The Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001–71.012, governs Count III. The decedent was domiciled in Texas, the prescribing decision and injury occurred in Texas, and Plaintiff is a surviving child within the class of statutory beneficiaries under § 71.004(a). Plaintiff preserves all claims under M.G.L. c. 229 in the alternative. Plaintiff's claims arise from Defendant's independent institutional and administrative conduct and do not depend upon the standard of care applicable to individual medical providers or bedside clinical judgment.

14. BCH never prescribed anything to him. BCH never examined him, evaluated him, or had any clinical contact with him. No physician–patient relationship existed between BCH and Dov Fischman at any time. BCH is not a defendant in this case based on any act or omission in the delivery of medical care. It is a defendant based on its contractual assumption of primary regulatory oversight of the TEAMMATE clinical trial, which was running at institutions involved in Dov Fischman's care, and its failure to exercise reasonable care in performing that oversight function. Plaintiff does not challenge the standard of care provided by any treating physician, does not seek review of any clinical judgment, and does not rely on any medical

Page 5

record of Dov Fischman's treatment to establish BCH's liability. The claims concern what BCH designed, approved, and controlled as an institution: the structure of a clinical trial, the oversight framework it imposed on participating sites, and the foreseeable consequences of the system it built and failed to adequately safeguard. These are institutional and regulatory failures, not medical ones. The tribunal requirement of M.G.L. c. 231, § 60B applies to actions for malpractice against providers of health care. BCH was not a provider of health care to this patient. Convening a medical malpractice tribunal would serve no purpose in this case and would impose procedural requirements unrelated to the claims at issue. This action proceeds under Massachusetts negligence law governing the institutional conduct of research oversight bodies.

15. This action is not barred, limited, or otherwise diminished by BCH's status as a nonprofit institution. The distinction is not formal — it is substantive. Nonprofit designation does not eliminate duties of reasonable care, does not insulate an institution from liability for its own negligence, and does not transform operational, institutional conduct into protected charitable activity. BCH is not sued here for the provision of charitable medical services to a patient. It is sued based on its affirmative undertaking of primary regulatory oversight of a multi-site clinical trial and its exercise of centralized authority over the design, approval, and supervision of that trial across participating institutions. Those activities are institutional, operational, and regulatory in nature. They involve the creation and control of a structured system governing investigator conduct and the dissemination of information within active clinical programs. Liability arises not from BCH's charitable status, but from the foreseeable consequences of the system it designed and failed to adequately safeguard. The duties at issue flow from BCH's voluntary undertaking of those responsibilities and apply regardless of its nonprofit designation. Accordingly, BCH's

Page 6

nonprofit status does not alter the legal standard governing its conduct and does not limit its accountability for the harms alleged in this action.

## IV. FACTUAL ALLEGATIONS

### A. BCH's Assumption of Primary Oversight Responsibility

16. By executing the SMART IRB Master Reliance Agreement and accepting the role of primary reviewing IRB for the TEAMMATE trial, BCH did not merely provide administrative approval. It exercised centralized authority over the structure, protocol, and oversight framework governing investigator conduct across all participating sites, including UTSW. That undertaking required BCH to ensure that the trial's design, implementation, and investigator conduct complied with federal human-subject protections; that risks were minimized and reasonable in relation to anticipated benefits; that consent materials disclosed foreseeable risks and available alternatives; and that conflicts of interest were identified and managed, including those arising when investigators simultaneously served as treating physicians. BCH also assumed ongoing obligations to require adverse-event reporting, conduct continuing review, and take corrective action when the trial was not conducted in accordance with applicable standards.

17. The TEAMMATE trial was conducted within clinical environments at participating sites, including UTSW, where physician-investigators operated in both research and clinical roles, had access to trial-related data and protocols, and treated non-enrolled patients using the same drug under study. This structural overlap made it reasonably foreseeable that trial-related frameworks would influence treatment decisions for non-enrolled patients absent adequate institutional controls.

18. BCH failed to implement reasonable safeguards to prevent trial-related frameworks from displacing individualized clinical assessment or exposing non-enrolled patients to study-related risks without corresponding protections, including measures to separate trial activities from general clinical care and policies addressing the risks created by dual-role physician-investigators.

**B. Everolimus: Commercial Development, Off-Label Status, and Known Risks**

19. Everolimus is an mTOR inhibitor approved by the FDA for limited indications, including use in certain transplant populations for the prevention of organ rejection and in certain oncology settings at different dosing regimens. Unlike calcineurin inhibitors, which have long served as the standard foundation of immunosuppressive therapy in transplant medicine and primarily target the immune pathways responsible for transplant rejection, everolimus acts through inhibition of the mTOR pathway, broadly suppressing immune system function and increasing susceptibility to infection and malignancy. At the time of the TEAMMATE trial, everolimus was not approved for use in heart transplantation in any population.

20. Everolimus carries FDA-mandated Black Box Warnings, the highest level of safety warning, for increased susceptibility to serious and opportunistic infections, the development of malignancies including lymphoma, and an increased risk of mortality in heart transplantation. These risks were well documented in transplant populations at the time of the TEAMMATE trial. BCH had a duty to ensure that these risks were adequately evaluated, disclosed, and managed both within the trial and in the clinical environments where physician-investigators operated.

21. Everolimus was developed and commercially positioned by Novartis Pharmaceuticals for its calcineurin inhibitor–sparing properties, specifically its potential to reduce nephrotoxicity associated with standard transplant immunosuppressants by permitting dose reduction or substitution. Clinical trials involving everolimus in transplant populations, including TEAMMATE, have consistently used renal function preservation as a primary or co-primary endpoint. That repeated focus aligns with Novartis's commercial interest in generating clinical data to support expanded off-label adoption of everolimus in transplant populations for which the drug lacked FDA approval. The TEAMMATE trial was funded primarily by the Department of Defense. Although Novartis did not publicly fund the trial, its commercial interests were advanced by the trial's design, as the kidney-sparing endpoints mirrored those used in prior everolimus trials to build a clinical record supporting broader use. Plaintiff alleges, on information and belief, that Novartis's involvement, including through investigator relationships, drug supply, or informational materials, extended beyond what is publicly documented, and that the trial's design served to generate data supporting expanded off-label use of everolimus in heart transplant populations while raising questions as to whether it addressed a genuinely unmet or independently validated clinical need.

22. Plaintiff alleges, on information and belief, that Novartis generated and disseminated promotional, educational, and study-related materials concerning everolimus within transplant research communities, and that BCH, in preparing or approving consent materials and informational frameworks for use in the TEAMMATE trial, relied upon or incorporated manufacturer-generated content without independent critical evaluation of its accuracy, completeness, or freedom from commercial bias. BCH, as the primary reviewing IRB, had an obligation to ensure that consent materials and investigator communications accurately reflected

the full scope of known risks and were not derived from or shaped by commercially biased sources. Plaintiff alleges that BCH failed to exercise that obligation, and that the resulting informational framework within which investigators operated minimized known risks while emphasizing the commercial endpoints that justified the trial.

23. Before approving a clinical trial introducing everolimus into heart transplant patients, BCH was required under 45 C.F.R. § 46.111 to determine that risks to subjects were minimized and reasonable in relation to anticipated benefits and to ensure that informed consent materials adequately described material risks. These obligations required a meaningful evaluation of the drug's known risks in light of available treatment options. They also reflect the principle of clinical equipoise, which requires genuine scientific uncertainty before exposing patients to the risks of a proposed intervention. Plaintiff alleges, on information and belief, that the TEAMMATE trial emphasized endpoints such as renal function and cardiac allograft vasculopathy while broader safety risks associated with everolimus were not given comparable weight. Although risks such as serious infection and malignancy would be monitored in any transplant study, the trial prioritized kidney-related and select clinical outcomes without requiring a comparably comprehensive evaluation of the drug's full risk profile. BCH approved a protocol and associated materials that did not require a sufficiently balanced assessment of everolimus's known risks and failed to implement oversight mechanisms to ensure those risks were consistently evaluated and communicated within the study and its associated clinical environment.

## C. UTSW's Admission of BCH's Primary Oversight Role

24. Plaintiff submitted a request under the Texas Public Information Act to UT Southwestern Medical Center ("UTSW") seeking records related to the TEAMMATE trial. In response, the

Page 10

University of Texas System's Office of General Counsel submitted representations to the Texas Attorney General, reflected in Exhibit A, including that: (1) records were prepared by, or at the direction of, Boston Children's Hospital's ("BCH") Institutional Review Board ("IRB") and provided to the University's IRB; (2) BCH's IRB had primary regulatory oversight of the trial; (3) UTSW relied on BCH's IRB pursuant to the SMART IRB Master Reliance Agreement; and (4) University employees acted as investigators or support staff in the TEAMMATE trial.

25.  On October 22, 2025, the Texas Attorney General issued an Open Records Letter Ruling confirming that the requested materials were prepared by, or at the direction of, BCH's IRB and that "BCH's IRB has primary regulatory oversight of the trial at issue." A true and correct copy of that ruling is attached as Exhibit B.

26.  These representations establish, prior to discovery, that BCH exercised primary regulatory oversight of the TEAMMATE trial, that such authority was formalized through a master reliance agreement, and that UTSW personnel participated as investigators or support staff under BCH's oversight structure. Plaintiff does not yet have access to records identifying which specific individuals at UTSW served in such roles or the extent of any overlap between trial involvement and clinical care, and discovery is required to determine those facts. The records governing the trial's design, consent materials, and oversight processes are within BCH's possession, custody, or control.

27.  Plaintiff has undertaken extensive efforts to obtain information regarding the TEAMMATE trial through available governmental and institutional channels, including TPIA requests to UTSW and Freedom of Information Act requests to federal agencies, including the United States Department of Defense and the National Institutes of Health. These efforts did not produce sufficient information to evaluate the trial's oversight, structure, or safety monitoring.

28.  Plaintiff also filed suit against UTSW in Dallas County District Court, Case No. DC-25-18350, where discovery is currently stayed. As a private institution, BCH is not subject to the same constraints and is a primary source of records necessary to evaluate its oversight conduct. This action seeks, among other relief, access to those records to determine the full scope of the TEAMMATE trial's role in the events giving rise to this case.

29.  What the Texas Attorney General proceedings established goes beyond confirming BCH's oversight role. They show that BCH functioned as the controlling authority over access to the records at issue. Responsive materials were produced through, or attributed to, BCH's IRB rather than through UTSW's own institutional processes. BCH acted as the responding authority for information concerning the trial's oversight, including the withholding of requested records. Whether that response was undertaken as a matter of obligation under the SMART IRB Master Reliance Agreement or voluntarily, the effect is the same. BCH exercised affirmative control over information related to the TEAMMATE trial and its oversight. Plaintiff relies on this documented record, not inference or speculation, to establish that BCH held primary regulatory authority over the trial and actively exercised that authority in ways that extended beyond the trial itself and into the administrative and legal proceedings that followed.

**D.  BCH's Institutional Oversight Failures**

30.  BCH approved consent and related materials used in the TEAMMATE trial, including at the UTSW site. Plaintiff alleges those materials did not adequately disclose material information necessary to evaluate the risks associated with everolimus, including its lack of FDA approval for use in adult heart transplantation, its known risk profile, its use in oncology at different dosing levels reflecting its effects on cellular proliferation, and the availability of alternative treatment approaches.

Page 12

31. BCH breached its duty of reasonable care in overseeing the TEAMMATE trial in the following respects:

- BCH failed to ensure that consent materials and related communications disclosed material risks and limitations associated with everolimus, including its lack of approval for use in heart transplantation and its known serious risk profile.

- BCH failed to ensure that the trial satisfied applicable risk-benefit standards and did not require a sufficiently balanced evaluation of the drug's known risks.

- BCH failed to implement sufficient safeguards to address foreseeable conflicts arising where physicians served as both investigators and treating clinicians.

- BCH failed to conduct adequate continuing review and failed to take appropriate corrective action as safety concerns emerged.

- BCH failed to implement or require structural separation between clinical trial activities and routine clinical care within participating programs.

These failures permitted trial-related data, information, and analytical frameworks to influence treatment approaches within clinical settings without requiring individualized reassessment of patient-specific conditions outside the structured protections of the trial.

32. BCH's failures to disclose known risks, ensure an appropriate risk-benefit balance, manage dual-role conflicts, conduct adequate continuing review, and maintain separation between trial activities and clinical care collectively permitted trial-related practices to influence the treatment of non-enrolled patients, including Dov Fischman, without the safeguards required within the trial.

**E. Dov Fischman's Treatment and the Decision to Transition to Everolimus**

33. Dov Fischman had been maintained on an established immunosuppressive regimen for approximately nine years following his heart transplant. During that period, he remained clinically stable, with no documented therapeutic failure or clinical emergency requiring a

Page 13

change in treatment, and no documented evaluation of alternative therapies has been identified to date prior to the initiation of everolimus.

34.  Plaintiff alleges, on information and belief, that the physician who prescribed everolimus coauthored research involving heart transplant patients and immunosuppressive regimens, was familiar with mTOR inhibitors through her research and professional work, had prior experience with everolimus at another academic transplant center that participated in the TEAMMATE trial, and held clinical privileges within the UTSW-affiliated transplant program, where she operated within the same institutional framework in which trial-related data, protocols, and practices were developed, disseminated, and utilized.

35.  Plaintiff alleges, on information and belief, that the prescribing physician, who served as section chief responsible for clinical policy or practice, told Plaintiff's family in December 2023 that she had recently begun working within the transplant program, despite publicly available information showing she joined UTSW in approximately 2021. She did not encounter Dov Fischman until after the clinical portion of the TEAMMATE trial concluded, raising questions as to whether his care was deferred during the trial. The extent of her role in the trial, and any related professional or financial relationships, is within Defendants' control and will be established through discovery.

36. Plaintiff alleges, on information and belief, that one or more of Dov Fischman's treating physicians at UTSW served as investigators, sub-investigators, or collaborators in the TEAMMATE trial or had access to data or protocols generated through the trial. The extent of that overlap, and whether those physicians participated in Dov Fischman's care during the relevant period, is within Defendants' control and will be established through discovery.

37. The everolimus prescribed to Dov Fischman was a generic formulation manufactured by Par Pharmaceutical. Plaintiff alleges, on information and belief, that this formulation may have been procured through the same or a similar institutional pathway used in the TEAMMATE trial, rather than as the result of an individualized clinical determination. Whether that formulation was used in the TEAMMATE trial at UTSW, and whether its selection for Dov Fischman reflected those pathways, is within Defendants' control and will be established through discovery.

38. Dov Fischman was not enrolled in the trial, did not execute a consent form, and was not informed that the drug was under active study or lacked approval for use in heart transplantation. He was therefore exposed to the risks of everolimus without the safeguards required within the clinical trial framework.

39. Plaintiff alleges that, without established regulatory guidance for the off-label use of everolimus in heart transplantation, treatment decisions were left to physician discretion without standardized safeguards. Plaintiff further alleges that the ongoing TEAMMATE trial within the same clinical environment influenced prescribing practices, resulting in the use of everolimus in non-enrolled patients without the protections applied within the trial itself.

## F. Adverse Events and Death

40. Following his transition to everolimus, Dov Fischman developed PTLD presenting as Hodgkin-type lymphoma and a serious infection that treating physicians were unable to identify. In the period leading up to these conditions, his family reported concerning side effects that indicated these issues were developing, but those reports were not meaningfully addressed.

41. PTLD and opportunistic infections are recognized risks of everolimus and were known within the TEAMMATE trial, where they were actively monitored and addressed under BCH's oversight. Despite that oversight framework, comparable monitoring and response were not applied in his care, allowing these warning signs to go unaddressed as his condition worsened.

42. During treatment, Dov Fischman also developed precancerous skin lesions, consistent with the drug's known risk profile. Despite the emergence of adverse effects, everolimus was not discontinued; dosing was maintained and, on information and belief, may have been increased during this period.

43. Dov Fischman died in January 2025. Plaintiff alleges that his death was proximately caused by the use of everolimus. That use occurred in a clinical setting shaped by BCH's institutional oversight authority, in which the safeguards necessary to evaluate and address its known risks were present within the trial but absent outside the trial setting.

## V. PRESERVATION OF EVIDENCE

44. The records necessary to determine the full relationship between the TEAMMATE trial and Dov Fischman's treatment are within the possession, custody, or control of BCH and related entities. These records include, but are not limited to, study protocols and amendments; consent materials; investigator rosters and role designations; financial disclosures and compensation arrangements; communications between BCH and participating sites, including UTSW; communications involving investigators and sponsors, including Novartis Pharmaceuticals; adverse-event reports and safety reviews; records reflecting investigator participation in the TEAMMATE trial; records reflecting the formulation or supplier of everolimus used in the trial; and records reflecting the transmission or use of Dov Fischman's clinical information in

connection with the trial. These materials are subject to discovery under the applicable rules of civil procedure.

45. Plaintiff seeks non-privileged, factual, and operational records concerning the structure, implementation, and oversight of the TEAMMATE trial and its interaction with clinical practice at participating sites, and does not seek materials protected by any applicable peer review or committee privilege, including internal IRB deliberations.

46. Plaintiff places BCH on formal notice of its obligation to preserve all such records in complete and unaltered form, including electronic communications, metadata, and draft materials, pending resolution of this action. Given the central relevance of these materials to BCH's oversight role and the risk of loss or alteration absent a preservation order, Plaintiff seeks an order requiring BCH to preserve all such records pending resolution of this action.

## VI. NATURE OF CLAIMS

47. Plaintiff's claims arise from BCH's external conduct in designing, implementing, and controlling a multi-site clinical trial structure that governed investigator conduct and affected clinical decision-making beyond enrolled participants, not from internal deliberations or committee recommendations. The acts and omissions at issue are operational and institutional in nature, not protected peer review activity, and do not involve materials or functions entitled to protection under any peer review or committee privilege. This is not a case about bedside medical care. It is a case about what BCH built, approved, and controlled as an institution, and the consequences of a clinical trial framework that extended into the care of a patient who was never enrolled in it. BCH did not treat Dov Fischman, did not prescribe to him, and had no clinical relationship with him. Accordingly, these claims do not constitute "malpractice, error or

mistake against a provider of health care" within the meaning of M.G.L. c. 231, § 60B and are not subject to tribunal screening or the procedural requirements applicable to health care malpractice actions.

48. BCH's duty did not depend on a physician–patient relationship or trial enrollment. By undertaking centralized regulatory control over the trial and its participating sites, BCH assumed a duty to exercise reasonable care in structuring and supervising that system, where it was reasonably foreseeable that its oversight would influence treatment decisions affecting non-enrolled patients within the same clinical programs.

## VII. SCIENTIFIC, RISK, AND INDUSTRY CONTEXT

49. Plaintiff alleges that the conduct at issue extends beyond a single clinical protocol and reflects broader patterns in the study, promotion, and use of everolimus in transplant populations. Plaintiff further alleges that the deficiencies identified in this action, including inadequate risk evaluation, insufficient independent scrutiny, and reliance on manufacturer-driven frameworks, were not limited to one trial.

50. Plaintiff alleges that everolimus, originally developed for oncology applications, exerts broad effects on cellular proliferation and immune function through mTOR inhibition that differ in scope from the more targeted mechanisms of calcineurin inhibitors. Plaintiff further alleges that everolimus inhibits the mTOR pathway, affecting cellular proliferation and repair processes across multiple tissue types, including vascular, epithelial, and immune cells, and has been associated with impaired tissue repair and delayed healing. Plaintiff alleges that BCH and the other institutions involved in the TEAMMATE trial did not adequately evaluate these broader,

well-documented effects independent of the drug's marketed kidney-sparing positioning when approving and overseeing the trial.

51. Plaintiff alleges, on information and belief, that the TEAMMATE trial was structured in a manner that supported adoption of everolimus in transplant practice rather than testing a genuinely open scientific question. Plaintiff further alleges that Novartis influenced the framework of the research through investigator relationships, drug supply, and educational or promotional materials, without being identified as a sponsor. Plaintiff alleges that the repeated use of kidney-sparing endpoints across trials helped build a clinical record supporting off-label use without FDA approval for that indication. BCH had an independent duty to evaluate whether the trial was scientifically and ethically justified and not to rely on manufacturer positioning.

52. Plaintiff alleges that the TEAMMATE trial was conducted within the same clinical environment in which Dov Fischman received care and involved the same physicians, program, and drug. Plaintiff further alleges that its presence within that environment influenced treatment decisions affecting him, including the prescription of everolimus and the absence of safeguards that would have applied within the trial. Plaintiff alleges that BCH's failure to exercise reasonable care in overseeing the TEAMMATE trial was a proximate and substantial cause of Dov Fischman's injury and death.

## VIII. CAUSES OF ACTION

### COUNT I — NEGLIGENCE AND NEGLIGENT UNDERTAKING

(Restatement (Second) of Torts §§ 323 and 324A)

53. Plaintiff incorporates by reference all preceding paragraphs. BCH, acting through its Institutional Review Board and pursuant to the SMART IRB Master Reliance Agreement,

undertook primary regulatory oversight of the TEAMMATE trial and owed a duty to exercise reasonable care in the performance of that undertaking across all participating sites, including UTSW. Plaintiff does not assert a private right of action under federal regulations but relies on those regulations as evidence of the applicable standard of reasonable care.

54. Under Restatement § 323, BCH voluntarily undertook responsibilities intended to protect trial participants and to implement safeguards governing the conduct of the trial within participating clinical environments. Given that trial personnel at UTSW, including physician-investigators, operated within both research and clinical settings, it was reasonably foreseeable that the trial's structure, requirements, and associated information would affect patients treated by those same physicians. Under Restatement § 324A, BCH's oversight services were services that UTSW and those who participated in the trial relied upon in structuring their conduct of the trial pursuant to the SMART IRB Master Reliance Agreement. The adequacy of those oversight functions directly affected the conditions under which treatment decisions were made. BCH's failure to exercise reasonable care under both provisions increased the risk of harm to Dov Fischman. See *Mullins v. Pine Manor College*, 389 Mass. 47 (1983).

55. BCH's duty of reasonable care included obligations to:

- ensure that consent materials disclosed material risks and limitations associated with the drug, including its lack of approval for the relevant patient population and known serious risks;

- ensure that the trial satisfied applicable risk-benefit standards under federal human-subject protections;

- identify and manage foreseeable conflicts arising from physicians serving as both investigators and treating clinicians;

- conduct meaningful continuing review; and

- take appropriate action when safety concerns arose.

BCH breached each of these duties. It approved consent materials and oversight structures that did not require a sufficiently balanced evaluation of known risks, failed to implement adequate safeguards to address foreseeable conflicts at the UTSW site, and did not ensure that trial-related risks and practices were not extended into clinical treatment settings without corresponding protections.

56. As a result, Dov Fischman was exposed to everolimus under conditions that increased the risk of serious harm. He developed adverse events consistent with the known risks of the drug and died. BCH's breach was a substantial factor in and proximate cause of Dov Fischman's death and Plaintiff's damages, including wrongful death damages, medical and funeral expenses, emotional distress, and loss of parental companionship, in an amount to be proven at trial.

## COUNT II — NEGLIGENT MISREPRESENTATION

(Restatement (Second) of Torts § 552)

57. Plaintiff incorporates by reference all preceding paragraphs. BCH reviewed, approved, and institutionally authorized consent materials and related communications used in connection with the TEAMMATE trial at participating sites, including UTSW. BCH knew, or should have known, that site investigators at UTSW would rely upon those materials in conducting the trial and in structuring practices within the same clinical environment. Those materials omitted material information regarding everolimus, including its lack of FDA approval for use in heart transplantation and its known serious risk profile, rendering them incomplete and misleading for their intended use by investigators.

58. The consent materials and related communications constituted information prepared, approved, and disseminated by BCH in the course of its professional activities for the guidance

of investigators and clinical personnel across participating institutions, intended to be relied upon in the conduct of the trial and in related clinical practices. Plaintiff further alleges, on information and belief, that those materials incorporated or relied upon manufacturer-generated content from Novartis without adequate independent evaluation, and that BCH's failure to conduct that evaluation contributed to the incomplete and misleading informational framework within which investigators operated and within which treatment decisions affecting non-enrolled patients, including Dov Fischman, were made.

59. BCH failed to exercise reasonable care in reviewing and approving these materials for use in the clinical and research environments in which they would foreseeably be relied upon. As a result, the clinical environment in which Dov Fischman's care was rendered was shaped by information regarding the drug's risks and limitations that was incomplete and, in context, misleading. BCH's failure to exercise reasonable care in providing accurate and complete information was a substantial factor in and proximate cause of the harm suffered by Dov Fischman, including the adverse events that led to his death.

## COUNT III — WRONGFUL DEATH

(Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001–71.012)

60. Plaintiff incorporates by reference all preceding paragraphs and brings this claim individually as a statutory beneficiary of Dov Fischman under § 71.004(a) as his surviving child. Dov Fischman died in January 2025 following exposure to everolimus at UTSW, a TEAMMATE trial site operating under BCH's primary oversight pursuant to the SMART IRB Master Reliance Agreement.

Page 22

61. BCH's failure to exercise reasonable care in its oversight of the TEAMMATE trial was a proximate cause and substantial factor in Dov Fischman's death. As a result, Plaintiff has suffered damages recoverable under Texas law, including loss of financial support, loss of companionship and society, mental anguish, and medical and funeral expenses, in an amount to be determined at trial. Plaintiff preserves all alternative claims under M.G.L. c. 229.

## IX. REQUEST FOR RELIEF

WHEREFORE, Plaintiff Gallit Fischman respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff on all Counts;

B. Award compensatory damages for the wrongful death of Dov Fischman under the Texas Wrongful Death Act and/or M.G.L. c. 229, including loss of financial support, loss of companionship and society, mental anguish, and medical and funeral expenses;

C. Award compensatory damages for Plaintiff's individual damages, including emotional distress and loss of parental companionship;

D. Enter a preservation order requiring BCH to retain all TEAMMATE trial records, site data, investigator communications, sponsor correspondence, financial disclosures, and interim data materials in complete and unaltered form pending resolution of this litigation;

E. Award costs of suit;

F. Award prejudgment interest as permitted by law; and

G. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

62.  Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil

Procedure 38(b).


Respectfully submitted,

Date: March 23, 2026


/s/ ‎*Gallit Fischman*‎ _____

**GALLIT FISCHMAN, Pro Se**

10114 Deermont Trail
Dallas, TX 75243
(214) 893-6720
gallitfischman@yahoo.com