IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GALLIT FISCHMAN, Individually, | § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:26-cv-11504 |
| BOSTON CHILDREN'S HOSPITAL, | § § § | |
| Defendant. | § § | |

---

**FIRST AMENDED COMPLAINT FOR NEGLIGENCE, NEGLIGENT UNDERTAKING, NEGLIGENT FAILURE TO WARN, GROSS NEGLIGENCE, AND WRONGFUL DEATH**
**(JURY TRIAL DEMANDED)**

---

Plaintiff Gallit Fischman files this First Amended Complaint against Defendant Boston Children's Hospital ("BCH"), referred to herein as "Boston Children's Hospital," "BCH," or "Defendant." This First Amended Complaint supersedes Plaintiff's original Complaint and is the operative pleading in this action.

## NATURE OF THE ACTION

1. This is a wrongful death and negligence action against BCH, the academic medical institution that contractually accepted primary regulatory oversight of TEAMMATE, a multi-site pediatric transplant study of the immunosuppressant everolimus, made by Novartis Pharmaceuticals.

2. This action concerns only the TEAMMATE clinical trial. BCH is named solely for its alleged role in accepting and exercising primary regulatory oversight of TEAMMATE. Plaintiff's claims target that conduct, not BCH's hospital operations or nonprofit status. TEAMMATE has

no separate legal existence, and Plaintiff asserts claims against BCH only as the entity alleged to have accepted and exercised that oversight.

3. BCH's primary oversight role is supported by documented representations made to the Texas Attorney General. UT System's counsel informed the Texas Attorney General that BCH's IRB held primary regulatory oversight of TEAMMATE under the SMART IRB Master Reliance Agreement, and that UTSW staff served as investigators or support under that framework. Those representations, and the Attorney General's ruling confirming them, are attached as Exhibits A and B.

4. Plaintiff's father, Dov Fischman, was never enrolled in TEAMMATE. He was treated in UTSW's adult heart transplant program, distinct from the UTSW pediatric program that served as one of TEAMMATE's participating trial sites under BCH's oversight. He had been clinically stable for nine years on an established immunosuppressive regimen, and everolimus was never offered or presented to him as an option during that period. Plaintiff alleges, on information and belief, that TEAMMATE introduced and normalized an everolimus-conversion framework within UTSW's transplant environment and displaced the clinic's long-standing reliance on Dov Fischman's stable regimen. After a new physician from another TEAMMATE participating site joined his care team, he was advised to switch to everolimus, a drug never FDA-approved for heart transplantation, despite no therapeutic failure of his existing regimen. Plaintiff alleges that this timing was not coincidental and that TEAMMATE's everolimus-conversion framework reached Dov Fischman through physicians and channels connecting UTSW's pediatric and adult programs despite his non-enrollment. He developed post-transplant lymphoproliferative disorder (PTLD) and a severe opportunistic infection, both recognized risks of the drug, and died in January 2025.

5.  BCH provided no care to Dov Fischman and had no physician-patient relationship with him. The duties alleged here arise solely from BCH's voluntary undertaking, independent of any clinical relationship.

## I. ALTERNATIVE PLEADING AND REQUEST FOR ISSUE-BY-ISSUE DETERMINATION

6.  Plaintiff's choice of forum reflects the distinct roles played by Massachusetts and Texas in the events giving rise to this action. From the outset, Plaintiff's intention has been that the wrongful-death claim be governed by Texas law, as the prescribing decisions, treatment, injuries, death, and resulting damages all occurred in Texas. Plaintiff filed this action in the District of Massachusetts, where the institutional conduct giving rise to Defendant's alleged liability occurred principally in Massachusetts. Boston Children's Hospital is domiciled in Massachusetts, and Plaintiff alleges that BCH accepted, organized, directed, and exercised primary regulatory oversight over the TEAMMATE clinical trial from Massachusetts pursuant to the SMART IRB Master Reliance Agreement.

7.  At the same time, TEAMMATE was a multi-site clinical trial extending beyond Massachusetts through participating institutions across the country, including UT Southwestern Medical Center in Texas. Plaintiff alleges that, by voluntarily accepting primary regulatory oversight of that multi-site undertaking, BCH assumed responsibilities whose foreseeable effects were not confined to Massachusetts but extended to participating institutions where the protocol was implemented.

8.  Accordingly, Plaintiff does not contend that every issue in this action is governed exclusively by the law of a single jurisdiction. Rather, Plaintiff alleges that the Court should determine the law applicable to each claim or issue according to the jurisdiction having the most

significant relationship to that claim or issue. Plaintiff specifically alleges that Texas law governs the wrongful-death claim arising from the treatment, injury, and death occurring in Texas, while Massachusetts law governs Defendant's institutional conduct in accepting and exercising primary regulatory oversight of TEAMMATE from Massachusetts.

9.  Plaintiff's claims are directed at BCH solely as the legal entity that allegedly accepted and exercised the institutional authority, responsibilities, and oversight of the TEAMMATE clinical trial. Plaintiff does not seek to impose liability upon BCH based upon its status as a hospital or healthcare provider, but based upon the institutional duties Plaintiff alleges BCH voluntarily undertook in governing TEAMMATE.

10.  In the alternative, should the Court determine that Texas law does not govern the wrongful-death claim, or that Plaintiff may not pursue that claim in her present capacity under the applicable law, Plaintiff respectfully requests that any such ruling be limited to the wrongful-death claim. Plaintiff further requests leave to amend this First Amended Complaint consistent with the Court's ruling and to proceed on any remaining causes of action the Court determines are independently cognizable.

## II. PARTIES

11.  Plaintiff Gallit Fischman is an individual residing in Dallas County, Texas. She brings this action solely in her individual capacity as a statutory wrongful-death beneficiary of her father, Dov Fischman, who died in January 2025 following treatment with everolimus at UT Southwestern Medical Center in Dallas, Texas. Plaintiff does not bring this action on behalf of any other person or entity. No estate has been opened, no survival claims are asserted, and Plaintiff seeks only those damages recoverable in her own right under the Texas Wrongful Death Act or any other independently cognizable cause of action permitted by the Court.

12.  Defendant Boston Children's Hospital is the trade name of The Children's Hospital Corporation, a Massachusetts nonprofit corporation with its principal place of business at 300 Longwood Avenue, Boston, Massachusetts 02115. BCH created, funds, staffs, and operates its Institutional Review Board ("BCH IRB") to meet its federal human-subjects research obligations. The IRB is BCH's instrumentality, and its acts and omissions alleged here are BCH's.

13.  At all relevant times, BCH, through its IRB and the SMART IRB Master Reliance Agreement, served as the reviewing authority with primary regulatory oversight of TEAMMATE.

14.  Public descriptions of TEAMMATE identify both Stanford Children's Hospital and BCH as leading the study. Stanford's precise role is not yet known. Plaintiff reserves the right to amend the pleadings to add Stanford or any other responsible entity if discovery reveals that it exercised relevant authority over the design, conduct, oversight, or administration of the trial.

### III. JURISDICTION AND VENUE

15.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is domiciled in Texas. Defendant, The Children's Hospital Corporation, is a Massachusetts nonprofit corporation with its principal place of business in Boston, Massachusetts. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks damages exceeding $5,000,000 for wrongful death, loss of parental companionship, mental anguish, medical expenses, funeral expenses, and other damages recoverable under applicable law.

16.  Venue is proper under 28 U.S.C. § 1391(b)(1), where BCH resides, and under § 1391(b)(2), where BCH's approval, continuing review, and oversight of the TEAMMATE protocol occurred in Massachusetts. This venue allegation does not waive Plaintiff's position that Texas wrongful-death law governs Plaintiff's wrongful-death claim.

### IV. APPLICABLE LAW

17.   Massachusetts applies the "most significant relationship" test to choice-of-law in tort cases. See *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631–32 (1985). BCH's oversight conduct, including its approvals, reviews, and omissions, occurred in Massachusetts. Massachusetts law therefore governs Plaintiff's claims for institutional negligence, negligent undertaking, negligent failure to warn, and gross negligence only. Plaintiff's wrongful-death claim is governed solely by the Texas Wrongful Death Act. To the extent additional choice-of-law issues arise during the litigation, Plaintiff requests that they be resolved on a claim-by-claim or issue-by-issue basis after the factual record has been developed.

18. Plaintiff invokes the Common Rule, 45 C.F.R. Part 46, and FDA regulations governing informed consent and IRB oversight, 21 C.F.R. Parts 50 and 56, as evidence of the standard of care applicable to an institution that voluntarily accepted primary IRB oversight of a federally regulated clinical trial, not as independent causes of action or as the basis for a private right of action. Those regulations reflect and parallel the independent common-law duties of reasonable care Plaintiff alleges BCH assumed through its voluntary institutional undertaking. See *Thorson v. Mandell*, 402 Mass. 744, 750 (1988). Courts outside Massachusetts have likewise recognized, as persuasive authority, that human-subject research may create duties owed by research institutions to persons foreseeably affected by their undertakings. See *Grimes v. Kennedy Krieger Inst., Inc.*, 782 A.2d 807, 858 (Md. 2001). Those duties arise from BCH's voluntary assumption of responsibility through its institutional undertaking and are not avoided by delegation to participating sites.

19.   Plaintiff pleads duty, breach, and proximate cause independently. Duty arises from BCH's voluntary oversight of TEAMMATE; breach arises from its alleged failure to exercise reasonable care in that role; and causation arises from the pathway by which TEAMMATE's

investigational framework allegedly reached Dov Fischman's treatment. A dispute over duty does not dispose of the separately pleaded breach and causation allegations.

20.  The Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001–71.012, governs Count IV. Dov Fischman was domiciled in Texas, the prescribing decision and injury occurred there, and Plaintiff is his surviving child and a statutory beneficiary under § 71.004(a). These claims rest on BCH's independent institutional conduct, not on the standard of care owed by individual treating providers.

21.  BCH never prescribed anything to Dov Fischman, examined him, treated him, or had clinical contact with him. BCH is a defendant after contractually assuming primary regulatory oversight of TEAMMATE at institutions involved in his care and allegedly failing to exercise reasonable care in that role. Plaintiff does not challenge any treating physician's standard of care or clinical judgment and does not rely on Dov Fischman's medical records to establish BCH's liability. The claims target what BCH designed, approved, and controlled institutionally: the trial structure, the oversight imposed on participating sites, and the foreseeable consequences of a system it built and failed to safeguard. These are institutional and regulatory failures, not medical-malpractice claims.

22.  The tribunal requirement of M.G.L. c. 231, § 60B applies to malpractice claims against health care providers. BCH provided no health care to Dov Fischman, and Plaintiff does not allege malpractice by BCH. Convening a tribunal would serve no purpose. This action proceeds under Massachusetts negligence law governing research-oversight institutions.

23.  Nor does the Texas Medical Liability Act apply. Plaintiff's claims rest on BCH's independent institutional conduct in governing and overseeing TEAMMATE, not on treatment, lack of treatment, or the standard of care rendered to Dov Fischman.

24. The absence of a physician-patient relationship between BCH and Dov Fischman does not eliminate the duty alleged herein. Plaintiff alleges that BCH's duty arose independently from its voluntary undertaking in accepting and exercising primary regulatory oversight over TEAMMATE. That alleged duty exists separately from any duty owed by a treating physician and is governed by the law applicable to institutional negligence and negligent undertaking rather than statutes governing claims arising from the rendition of medical care.

25. BCH's nonprofit status does not bar or limit this action. Nonprofit designation does not eliminate the duty of reasonable care, insulate an institution from its own negligence, or convert operational conduct into protected charitable activity. BCH is not sued for providing charitable medical services. It is sued for its affirmative undertaking of primary regulatory oversight of a multi-site trial and the centralized authority it exercised over that trial's design, approval, and supervision. Plaintiff alleges liability arises from the foreseeable consequences of that system, not from BCH's charitable status.

26. To the extent BCH invokes G.L. c. 231, § 85K on the theory that governing a multi-center trial is categorically a charitable act, that argument does not resolve this case at the pleading stage. Whether governing a twenty-five-institution investigational trial, spanning institutions unaffiliated with BCH, falls within BCH's charitable purpose is itself a factual and legal issue requiring a developed record. BCH's articles of organization describe its purpose as providing medical care, operating hospitals, training clinicians, supporting patient-care research, and promoting community health. Plaintiff does not dispute BCH's charitable status, but the challenged conduct was not confined to medical care in BCH's own hospital or research for BCH's own patients. A charitable corporation does not carry every activity into its charitable shield merely by virtue of its corporate status.

27.   Plaintiff alleges that Defendant is not entitled to any governmental or derivative immunity based solely on TEAMMATE's receipt of funding from the United States Department of Defense. Plaintiff alleges, on information and belief, that Defendant did not enter into a procurement contract to perform services for the United States Government, but instead participated in TEAMMATE through federal research grant funding. Such grant funding did not transform Defendant into a government contractor or immunize Defendant from claims based on its own independent institutional conduct, decisions, omissions, and responsibilities. Any asserted immunity defense therefore does not bar the claims asserted herein.

## V. INVESTIGATIONAL RESEARCH OVERSIGHT AND PUBLIC ACCOUNTABILITY

28.   Defendant voluntarily accepted primary regulatory oversight over the TEAMMATE clinical trial and assumed institutional responsibilities arising from that undertaking. Plaintiff alleges that Defendant owed a duty to exercise reasonable care in performing those responsibilities, including implementing reasonable safeguards to prevent foreseeable spillover of an investigational treatment framework beyond the confines of the trial.

29.   Plaintiff does not allege a duty extending to all research institutions, all clinical trials, or all patients prescribed similar medications. Plaintiff alleges a duty arising solely from Defendant's own voluntary undertaking, its own institutional conduct, and the foreseeable consequences of that conduct within the specific multi-site clinical trial over which Defendant accepted primary regulatory oversight.

30.   Plaintiff further alleges that recognition of such a duty advances the public interest by promoting responsible institutional oversight, accurate risk communication, and appropriate separation between clinical research and routine patient care. Public confidence in clinical research

is strengthened by requiring institutions that voluntarily undertake primary regulatory oversight to exercise reasonable care in fulfilling those responsibilities.

## VI. FACTUAL ALLEGATIONS

31.  Plaintiff does not allege BCH treated Dov Fischman or owed him a physician-patient duty. She alleges BCH voluntarily undertook institutional responsibility by accepting and exercising primary regulatory oversight of TEAMMATE, and that the duties alleged here arise from that undertaking.

### A. BCH's Assumption of Primary Oversight Responsibility

32.  By executing the SMART IRB Master Reliance Agreement and accepting the role of primary reviewing IRB for TEAMMATE, BCH did more than grant administrative approval: it took centralized authority over the trial's structure, protocol, and oversight across every participating site, including UTSW. Plaintiff alleges that undertaking obligated BCH to ensure the trial complied with federal human-subject protections, that its risks were justified and disclosed, and that conflicts of interest, including investigators who also treated patients, were identified and managed. BCH also assumed ongoing duties of adverse-event reporting, continuing review, and corrective action.

33.  TEAMMATE would not have proceeded without BCH's institutional actions. Such a research process exists to evaluate an investigational strategy's safety and effectiveness within a controlled framework before it reaches routine patient care.

34.  The duties alleged here arise not from BCH's status as a hospital, but from the institutional responsibilities it voluntarily accepted for TEAMMATE. Had another institution accepted those responsibilities instead, Plaintiff's claims would be directed there.

35. TEAMMATE ran through UTSW's pediatric transplant program, but its influence was not necessarily confined to enrolled pediatric participants. Plaintiff alleges, on information and belief, that TEAMMATE generated data, protocols, conclusions, and an everolimus-conversion framework that could be shared through institutional practice, physician knowledge, transplant-program communication, and treatment norms within UTSW. Through those channels, the TEAMMATE framework was capable of moving beyond the pediatric study population and influencing UTSW's separate adult transplant program, where Dov Fischman was treated.

36. Absent controls separating research use from ordinary clinical decision-making, that pathway made it foreseeable that TEAMMATE's everolimus-conversion framework could shape treatment decisions for non-enrolled adult patients like Dov Fischman.

37. Plaintiff alleges BCH failed to implement safeguards adequate to keep trial-related frameworks from displacing individualized clinical judgment or exposing non-enrolled patients to study risks without protection. The allegations below describe BCH's alleged oversight failures.

**B. The Scope of BCH's Institutional Role Extended Well Beyond Data Coordination**

38. Plaintiff alleges that BCH's responsibilities extended beyond serving as TEAMMATE's Data Coordinating Center and Statistical Principal Investigator. Plaintiff further alleges that BCH played an active role in developing, communicating, and implementing the TEAMMATE treatment framework across participating sites, creating foreseeable channels through which that framework could influence physicians practicing within the same institutional environment as TEAMMATE investigators, including those who treated Dov Fischman.

39. The precise scope of BCH's institutional responsibilities for TEAMMATE is known primarily to BCH. Plaintiff alleges, on information and belief, that those responsibilities extended beyond statistical analysis to the trial's governance, administration, and institutional oversight.

40. TEAMMATE's publicly stated objective was to generate evidence to inform future clinical practice. BCH described the trial publicly through publications and trial materials, but Plaintiff alleges those descriptions do not reflect its internal governance and administration, the details of which remain in BCH's possession.

41. UTSW's counsel informed the Texas Attorney General that BCH's IRB held primary regulatory oversight of TEAMMATE and that responsive records came from that IRB. Plaintiff alleges that this confirms BCH's institutional oversight role and supports a reasonable inference that BCH's responsibilities were not limited to data coordination or statistical analysis. The scope of BCH's governance, administration, and oversight responsibilities remains a matter for discovery.

**C. Everolimus: Commercial Development, Off-Label Status, and Known Risks**

42. Everolimus is an mTOR inhibitor FDA-approved for limited transplant and oncology indications. Unlike calcineurin inhibitors, the longstanding standard of transplant immunosuppression that target rejection-specific immune pathways, everolimus broadly suppresses immune function through mTOR inhibition, raising infection and malignancy risk. mTOR inhibition also impairs cellular repair across tissue types, associated with delayed wound healing. At the time of TEAMMATE, everolimus was not approved for heart transplantation in any population.

43. Everolimus carries FDA Black Box Warnings, its highest safety designation, for serious infection, malignancy including lymphoma, and increased mortality in heart transplantation. See Exhibit D. These risks were well documented at the time of TEAMMATE. Plaintiff alleges BCH had a duty to ensure they were evaluated, disclosed, and managed both within the trial and in the clinical environments where its investigators worked.

44. Novartis developed and commercially positioned everolimus as part of a calcineurin-inhibitor-reduction strategy. Any claimed kidney-sparing benefit came from reducing CNI-associated nephrotoxicity, not from any independent kidney-protective property of everolimus itself. Trials involving everolimus in transplant populations, including TEAMMATE, used renal preservation as a central endpoint, aligning with Novartis's interest in data supporting broader adoption. The Department of Defense primarily funded TEAMMATE, and Plaintiff seeks discovery into why that funding was provided, what objectives it served, and how those objectives shaped the trial's design. Although Novartis did not publicly fund the trial, Plaintiff alleges, on information and belief, that Novartis's involvement through investigator relationships, drug supply, or informational materials extended beyond what is publicly documented.

45. Plaintiff alleges, on information and belief, that Novartis generated and disseminated promotional or educational materials on everolimus within transplant research communities, and that BCH approved TEAMMATE consent materials and investigator communications without adequate independent evaluation for accuracy, balance, or commercial bias.

46. TEAMMATE materials described the tacrolimus/MMF arm as a regimen "used in several thousand children already," while stating that the tacrolimus/everolimus arm's benefits "may include fewer transplant complications" and "may reduce rejection, coronary artery disease, and kidney disease." See Exhibit C. The materials also stated that everolimus was "approved for adult heart transplantation in Europe," which Plaintiff alleges blurred the distinction between foreign approval and the absence of FDA approval for heart transplantation in the United States.

47. Plaintiff alleges that BCH approved a protocol and materials that emphasized endpoints favoring everolimus conversion over the established tacrolimus-based standard of care while giving insufficient weight to the drug's boxed-warning risks of serious infection,

malignancy, and death. BCH was responsible for overseeing TEAMMATE's design, materials, and communications, and Plaintiff alleges that BCH failed to implement safeguards preventing that investigational framework from influencing non-enrolled patients treated in the same clinical environment.

48.    BCH cannot avoid Plaintiff's allegations by calling TEAMMATE a pediatric trial. FDA guidance generally defines the pediatric population for drug development as patients from birth to younger than 17 years of age. TEAMMATE extended eligibility through age 21, meaning it included adults ages 18 to 21. More importantly, TEAMMATE studied the same treatment framework later used on Dov Fischman: taking stable transplant recipients off established calcineurin-inhibitor therapy and transitioning them to everolimus. Dov Fischman was a stable heart-transplant patient who was transitioned from his established regimen to everolimus outside the trial. Plaintiff's allegations do not depend on his enrollment eligibility; they depend on BCH's alleged failure to keep TEAMMATE's everolimus-conversion framework from reaching non-enrolled patients in the same transplant environment where that framework was created, studied, and communicated.

49.    TEAMMATE enrolled more than two hundred pediatric, adolescent, and adult transplant recipients. It compared everolimus, which had no FDA-approved role in heart transplantation in the United States, against tacrolimus, an established calcineurin inhibitor approved for use in adult heart-transplant care. Plaintiff acknowledges that no immunosuppressive regimen is specifically FDA-approved for pediatric heart transplantation. TEAMMATE's stated objective was to help achieve the first FDA approval of anti-rejection medicines for pediatric heart transplantation. See Exhibit C. BCH selected an everolimus-based strategy even though other immunosuppressive drugs already had FDA approval for adult heart transplantation. Plaintiff

alleges that this design and messaging foreseeably encouraged broader acceptance of everolimus conversion beyond the enrolled population.

**D. UTSW's Admission of BCH's Primary Oversight Role**

50.   Plaintiff's investigation originally focused on UTSW, but Texas Attorney General proceedings identified BCH as the institution exercising primary regulatory oversight of TEAMMATE, redirecting the investigation.

51.   Plaintiff requested TEAMMATE-related records from UTSW under the Texas Public Information Act. In response, UT System's Office of General Counsel represented to the Texas Attorney General, reflected in Exhibit A, that: (1) records were prepared by, or at the direction of, BCH's Institutional Review Board ("IRB") and provided to the University's IRB; (2) BCH's IRB had primary regulatory oversight of the trial; (3) UTSW relied on BCH's IRB under the SMART IRB Master Reliance Agreement; and (4) University employees acted as investigators or support staff in TEAMMATE.

52.   On October 22, 2025, the Texas Attorney General issued an Open Records Letter Ruling confirming that the requested materials were prepared by, or at the direction of, BCH's IRB and that "BCH's IRB has primary regulatory oversight of the trial at issue." A true and correct copy of that ruling is attached as Exhibit B.

53.   These representations establish, before discovery, that BCH exercised primary regulatory oversight of TEAMMATE under a formalized reliance agreement, and that UTSW personnel served as investigators or support staff under that oversight. The record also shows BCH controlled access to trial records: responsive materials came through its IRB, and BCH functioned as the responding authority on the trial's oversight, including withheld records. Plaintiff relies on this documented record, not inference, to establish BCH's primary regulatory authority. Which

specific UTSW individuals served in what roles, and the extent of overlap with clinical care, remain within BCH's possession and require discovery.

54. Plaintiff has pursued TEAMMATE-related records through TPIA requests to UTSW and FOIA requests to the Department of Defense and the National Institutes of Health. These efforts did not yield enough information to evaluate the trial's oversight, structure, or safety monitoring.

55. Plaintiff previously sued UTSW in Dallas County District Court, Case No. DC-25-18350, but that case closed before discovery opened. Plaintiff therefore never obtained the records needed to determine the scope of BCH's oversight of TEAMMATE or its connection to Dov Fischman's treatment. Those records remain in BCH's possession and are the subject of this action.

56. Plaintiff alleges that BCH held the central institutional knowledge of TEAMMATE's design, governance, oversight, and communications to participating sites. Those facts are necessary to determine how TEAMMATE's everolimus-conversion framework reached the clinical environment in which Dov Fischman was treated.

57. Plaintiff alleges BCH cannot claim the institutional responsibility it represented to the Texas Attorney General while disclaiming the foreseeable consequences of that same role. Having admitted TEAMMATE operated under its primary regulatory authority, BCH cannot now call that authority too attenuated to support the duties alleged here.

**E. BCH's Institutional Oversight Failures**

58. Plaintiff alleges that BCH approved the consent materials used in TEAMMATE, including at UTSW, and that those materials failed to adequately disclose everolimus's lack of FDA approval for adult heart transplantation, its known risk profile, its oncology use at different doses, and available alternatives.

59. Plaintiff alleges that BCH breached its duty of reasonable care in overseeing TEAMMATE in the following respects:

• BCH failed to ensure consent materials disclosed everolimus's lack of approval for heart transplantation and its known risk profile.

• BCH failed to ensure the trial met applicable risk-benefit standards or required a balanced evaluation of known risks.

• BCH failed to safeguard against foreseeable conflicts where physicians served as both investigators and treating clinicians.

• BCH failed to conduct adequate continuing review or take corrective action as safety concerns emerged.

• BCH failed to require structural separation between trial activities and routine clinical care.

60. These failures let TEAMMATE's data and frameworks shape treatment, including Dov Fischman's, without the individualized reassessment the trial's own protections required.

**F. Dov Fischman's Treatment and the Decision to Transition to Everolimus**

61. Dov Fischman remained clinically stable for nine years after his heart transplant on an established immunosuppressive regimen. He had no documented progressive renal failure, cardiac allograft vasculopathy, therapeutic failure, or documented evaluation of alternatives before he was switched to everolimus. Plaintiff alleges, on information and belief, that before TEAMMATE reached UTSW, everolimus conversion was not part of his adult heart-transplant clinic's ordinary practice and was never presented to him as a treatment option. Plaintiff further alleges that after TEAMMATE introduced and studied an everolimus-conversion framework within UTSW's transplant environment, that framework displaced the clinic's long-standing reliance on his stable

regimen and led to his transition to everolimus outside the trial, without enrollment, trial consent, or trial-level safeguards.

62. Plaintiff alleges, on information and belief, that the prescribing physician had research experience in heart-transplant immunosuppression, was familiar with mTOR inhibitors, had prior everolimus experience at another TEAMMATE site, and held privileges in the UTSW transplant program where TEAMMATE-related data and protocols were developed and used.

63. Plaintiff alleges, on information and belief, that the prescribing physician told Plaintiff's family she had converted patients to everolimus at her prior institution, itself a TEAMMATE site, and intended to do the same at UTSW. Plaintiff alleges that this reflected a broader institutional shift toward everolimus conversion, driven by the investigational framework BCH approved and oversaw through TEAMMATE. Everolimus was therefore presented to Dov Fischman's family not as a major departure from a stable nine-year regimen, but as a routine, low-risk substitution. Plaintiff alleges that the recommendation reflected the same everolimus-conversion framework TEAMMATE was created to evaluate and that BCH allowed to extend beyond enrolled participants through inadequate institutional safeguards and oversight.

64. Plaintiff alleges that TEAMMATE's safety-and-benefit narrative portrayed everolimus conversion as a routine, low-risk treatment change rather than a significant departure from established therapy requiring heightened disclosure. Plaintiff alleges that Dov Fischman never signed an informed-consent form for everolimus and was never told the drug was unapproved for heart transplantation, represented a departure from his established regimen, or carried boxed-warning risks of infection, malignancy, and death. Had those facts been disclosed, he would not have agreed to the conversion.

65.  Plaintiff alleges, on information and belief, that one or more of Dov Fischman's treating physicians served as TEAMMATE investigators or had access to its data or protocols. The extent of that overlap, and whether those physicians treated him during the relevant period, remain within BCH's control and are matters for discovery.

66.  The everolimus provided to Dov Fischman was selected and supplied through institutional pharmacy processes over which he had no control. Plaintiff alleges, on information and belief, that the drug may have been procured, selected, or supplied through institutional pathways influenced by TEAMMATE's everolimus-conversion framework rather than through individualized clinical judgment alone. The procurement, selection, and supply pathways for everolimus used in TEAMMATE and in Dov Fischman's treatment remain matters within BCH's knowledge for discovery.

67.  Dov Fischman was never enrolled in TEAMMATE, signed no trial consent form, and received none of the trial's required safeguards or protocol monitoring. Plaintiff alleges that, despite receiving none of those protections, he was transitioned to the same everolimus-conversion strategy the trial was evaluating.

68.  With no regulatory guidance for off-label everolimus use in heart transplantation, treatment decisions were left to physician discretion without standardized safeguards. Plaintiff alleges that this discretion was influenced by TEAMMATE's everolimus-conversion framework. Plaintiff does not allege a general duty by BCH to supervise every UTSW physician. Plaintiff alleges the narrower claim that BCH's institutional role in TEAMMATE created a research framework that foreseeably shaped the prescribing environment in which Dov Fischman was later treated.

**G. Adverse Events and Death**

69.    After transitioning to everolimus, Dov Fischman developed PTLD presenting as Hodgkin-type lymphoma and a serious infection his physicians could not identify. His family reported concerning symptoms beforehand, but those reports went unaddressed.

70.    PTLD and opportunistic infection are recognized everolimus risks that TEAMMATE monitored under BCH's oversight. Plaintiff alleges that TEAMMATE's safety-and-benefit narrative normalized everolimus conversion and obscured the seriousness of its known risks, contributing to a clinical environment in which warning signs in non-enrolled patients like Dov Fischman were more likely to be missed, minimized, or disconnected from everolimus exposure.

71.    No comparable trial safeguards, adverse-event monitoring, or discontinuation criteria applied to Dov Fischman. As a result, warning signs consistent with everolimus toxicity were not treated as drug-related signals, and his condition worsened.

72.    Dov Fischman also developed precancerous skin lesions consistent with everolimus's known risk profile. Despite those adverse effects, everolimus was not discontinued; dosing was maintained and, on information and belief, may have been increased.

73.    Dov Fischman died in January 2025. Plaintiff alleges that his death was proximately caused by the use of everolimus in a clinical setting shaped by TEAMMATE's everolimus-conversion framework, but without the safeguards TEAMMATE used to evaluate, monitor, and respond to those same risks.

## VII. PRESERVATION OF EVIDENCE

74.    The records needed to determine the full relationship between TEAMMATE and Dov Fischman's treatment are within BCH's and related entities' possession, custody, or control. These include the trial's protocols, consent materials, investigator rosters, financial and compensation records, communications among BCH, participating sites, and sponsors including Novartis,

adverse-event and safety records, and any record of Dov Fischman's clinical information reaching the trial. All are subject to discovery under the applicable rules of civil procedure.

75. Plaintiff seeks non-privileged factual and operational records concerning TEAMMATE's structure, implementation, oversight, safety data, funding rationale, and interaction with clinical practice at participating sites, including records showing what safeguards existed to prevent trial results from supporting everolimus conversion beyond the enrolled population. Plaintiff does not seek privileged peer-review or IRB deliberation materials.

76. Plaintiff places BCH on formal notice to preserve all such records, including electronic communications, metadata, and drafts, in complete and unaltered form pending resolution. Given their central relevance and the risk of loss absent an order, Plaintiff seeks an order requiring BCH to preserve them.

## VIII. NATURE OF CLAIMS: THE THEORY OF LIABILITY

### A. Discovery Is the Proper Vehicle for Resolving BCH's Institutional Role

77. Whether TEAMMATE allegedly influenced Dov Fischman's treatment depends on facts within BCH's exclusive possession: how the trial was governed, how information moved among participating institutions, and whether TEAMMATE's institutional knowledge shaped his clinical environment. Those issues cannot be resolved on the pleadings. BCH's governance and oversight records, the only records that could actually establish how TEAMMATE operated, remain in its possession and are exactly what Plaintiff seeks through discovery.

### B. Plaintiff's Causation Allegations Are Plausible at the Pleading Stage

78. Plaintiff has alleged more than a speculative connection. For nine years, everolimus was never part of Dov Fischman's stable post-transplant care. Then, while TEAMMATE was underway within the same transplant environment under BCH's primary regulatory oversight, the

same everolimus-conversion strategy being evaluated in the trial was presented to him as a safe alternative outside the trial. Plaintiff further alleges that the prescribing physician had prior TEAMMATE ties and recommended that same conversion approach. These facts plausibly allege that TEAMMATE's framework reached Dov Fischman's care, and the full extent of that connection is a matter for discovery, not dismissal at the pleading stage.

**C. Off-Label Prescribing Required Independent Clinical Judgment**

79. Plaintiff does not allege that off-label prescribing is unlawful. Plaintiff alleges that, in the absence of FDA approval or established regulatory guidance for everolimus in heart transplantation, any decision to prescribe it off label required heightened independent clinical judgment and careful evaluation of its known risks, available alternatives, and the patient's individual circumstances. Plaintiff alleges that TEAMMATE's everolimus-conversion framework displaced that individualized assessment by presenting the conversion as a routine, low-risk treatment strategy, allowing an investigational approach to become part of ordinary clinical practice before its safety had been established.

### IX. FACTUAL ISSUES REQUIRING DISCOVERY

80. Plaintiff expects discovery to address facts including, but not limited to, the following:

- Whether the physicians involved in Dov Fischman's care were recruited to UTSW based on their experience with TEAMMATE, everolimus, or immunosuppressive-conversion research.

- Whether any physician involved in Dov Fischman's care also participated in TEAMMATE in any capacity.

• Whether TEAMMATE utilized the same Epic electronic health record system as the clinical environment, and whether treating physicians could access information generated through the trial.

• Whether the physicians responsible for Dov Fischman's care received any data, guidance, or education generated by TEAMMATE.

• Whether TEAMMATE-related education or information was provided to the broader heart-transplant clinic or clinical staff at UTSW.

• What TEAMMATE's criteria and guidance were for converting patients to everolimus, including monitoring, adverse-event management, and discontinuation criteria.

• Whether TEAMMATE's switching and safety guidance was shared with, adopted by, or withheld from the clinical heart-transplant program.

• Whether physicians involved in Dov Fischman's care used, published, received, or relied on TEAMMATE data, Novartis promotional materials, or other everolimus-related information derived from or connected to TEAMMATE.

• Whether any UTSW physicians authored publications or materials based on TEAMMATE data, including any that discussed trial data without identifying its source.

• Whether TEAMMATE's final results and complete safety and outcome data have been finalized, reported, published, withheld, or selectively disclosed.

• Whether TEAMMATE's final results include comprehensive safety data beyond selected efficacy endpoints, including all adverse events, deaths, and complications.

• Whether adverse events, deaths, infections, malignancies, PTLD, or other safety concerns associated with everolimus were reported to BCH during TEAMMATE, and what actions, if any, BCH took to investigate, communicate, mitigate, or respond to those events.

• Whether the patient assistance program and prescription pathway through which Dov Fischman received everolimus was the same pathway used by TEAMMATE, or was otherwise influenced by the trial.

• The process by which TEAMMATE was presented to and approved by the institutional review board, including the role of the sponsor in that process.

• The amount of funding provided for TEAMMATE overall and the amount provided specifically to UTSW.

• What participant-facing materials and communications were used before and during TEAMMATE, including materials directed to parents or guardians, how those materials described everolimus's risks, benefits, alternatives, and treatment purpose, and whether they were revised during the trial.

• The nature of the relationships among TEAMMATE, Novartis, BCH, and all other entities involved in the trial.

• What safeguards kept TEAMMATE's data, interim results, and safety findings contained within the research setting.

• What confidentiality or data-use agreements and institutional policies governed access to TEAMMATE information.

• How TEAMMATE data was stored, accessed, and shared, including who had access and under what authority.

• Whether any of Dov Fischman's clinical information or medical data was shared with, used by, or incorporated into TEAMMATE.

## X. CAUSES OF ACTION

**COUNT I: INSTITUTIONAL NEGLIGENCE AND NEGLIGENT UNDERTAKING**

*(Restatement (Second) of Torts §§ 323 and 324A)*

81.  Plaintiff incorporates all preceding paragraphs. BCH, through its IRB and the SMART IRB Master Reliance Agreement, voluntarily undertook primary regulatory oversight of TEAMMATE, including oversight of the protocol, consent materials, continuing review, adverse-event monitoring, investigator communications, and safeguards governing participating sites, including UTSW.

82.  The institutional responsibilities BCH voluntarily undertook are independent of any physician-patient relationship and arise from BCH's own conduct in creating, approving, governing, and supervising TEAMMATE.

83.  BCH owed a duty to exercise reasonable care in performing that undertaking, including reasonable care to ensure that TEAMMATE's investigational everolimus-conversion framework remained confined to enrolled participants, was communicated with appropriate risk safeguards, and did not foreseeably spill over into routine care for non-enrolled patients without the protections required in the research setting. The Common Rule, 45 C.F.R. Part 46, and FDA regulations governing informed consent and IRB oversight, 21 C.F.R. Parts 50 and 56, provide evidence of the standard of care applicable to that undertaking, but are not asserted as independent causes of action.

84.  UTSW trial personnel operated in both research and clinical environments, making it foreseeable that TEAMMATE's structure, data, education, and treatment philosophy could affect patients those same physicians treated outside the trial. This foreseeable pathway satisfies Restatement (Second) of Torts §§ 323 and 324A and did not depend on any physician-patient relationship between BCH and Dov Fischman.

85. BCH breached its institutional duties by approving and overseeing TEAMMATE without adequate safeguards separating research activity from routine clinical care, without adequate controls over dual-role conflicts at UTSW, without adequate safeguards preventing trial-derived practices from reaching non-enrolled patients, and without requiring independent reassessment before the everolimus-conversion framework was used outside the trial.

86. Those breaches created a foreseeable and unreasonable risk that TEAMMATE's investigational framework would extend beyond enrolled participants and influence routine clinical care without trial consent, trial monitoring, trial discontinuation criteria, or trial-level safety protections.

87. Plaintiff alleges that BCH's negligent institutional undertaking was a factual and proximate cause of the TEAMMATE-derived everolimus-conversion approach reaching Dov Fischman's clinical environment. These allegations state an independent negligence and negligent-undertaking claim arising from BCH's own institutional conduct.

**COUNT II: NEGLIGENT FAILURE TO WARN AND COMMUNICATE RISK**

88. Plaintiff incorporates all preceding paragraphs. BCH assumed institutional responsibility for TEAMMATE's risk communications, consent framework, investigator communications, trial materials, and the manner in which the everolimus-conversion strategy was presented and communicated within participating institutions.

89. BCH knew or should have known that everolimus was not FDA-approved for heart transplantation and carried FDA Boxed Warnings for serious infection, malignancy, and increased mortality in heart transplantation. See Exhibit D. BCH also knew or should have known that those risks required careful disclosure, monitoring, and containment when everolimus was studied in transplant recipients.

90. BCH breached its duty to communicate risk with reasonable care by approving, permitting, or failing to correct an incomplete risk framework that emphasized selected benefits of everolimus conversion while failing to communicate, with comparable weight, the drug's lack of FDA approval for heart transplantation, its boxed-warning risks, the limitations of the pediatric-trial setting, and the need to prevent trial-derived treatment approaches from reaching non-enrolled patients without appropriate safeguards.

91. Plaintiff alleges that BCH's failure to warn and communicate risk allowed an incomplete and misleading safety framework to extend beyond TEAMMATE and into the surrounding clinical environment at UTSW. That failure constituted an independent breach of BCH's institutional duties arising from its oversight of TEAMMATE.

92. Plaintiff alleges that adequate institutional warnings and risk communications would have required rejecting, modifying, containing, or discontinuing the everolimus-conversion approach before it reached non-enrolled patients such as Dov Fischman.

## COUNT III: GROSS NEGLIGENCE

93. Plaintiff incorporates all preceding paragraphs. BCH accepted primary regulatory oversight of a multi-site clinical trial involving a high-risk immunosuppressive drug that lacked FDA approval for heart transplantation and carried known risks of serious infection, malignancy, lymphoma, PTLD, impaired wound healing, and death.

94. Plaintiff alleges, on information and belief, that BCH's senior managerial agents and institutional decisionmakers knew of those risks, knew that TEAMMATE involved physician-investigators operating in clinical transplant environments, and knew or should have known that trial-derived information and treatment frameworks could foreseeably affect non-enrolled patients if not properly contained.

95.  Despite that knowledge, BCH authorized, approved, or permitted an oversight structure that made no meaningful effort to separate research from clinical care, control dual-role conflicts, prevent trial-derived practices from reaching non-enrolled patients, or ensure that known everolimus risks were communicated and managed with reasonable care.

96.  Plaintiff alleges that this conduct involved an extreme degree of risk to vulnerable transplant recipients and reflected conscious indifference to the rights, welfare, and safety of persons foreseeably affected by TEAMMATE's institutional framework, including non-enrolled patients in the same transplant environment.

97.  These allegations independently support a claim for gross negligence under the law determined applicable by the Court.

**COUNT IV: WRONGFUL DEATH**

*(Tex. Civ. Prac. & Rem. Code §§ 71.001–71.012)*

98.  Plaintiff incorporates all preceding paragraphs, including Counts I through III. Plaintiff brings this count as Dov Fischman's surviving child and statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004(a).

99.  Dov Fischman was domiciled in Texas, received the treatment at issue in Texas, was injured in Texas, and died in Texas in January 2025. The prescribing decisions, clinical implementation, injury, death, witnesses, treating physicians, medical records, and resulting damages are centered in Texas. Plaintiff therefore alleges that the Texas Wrongful Death Act governs the wrongful-death claim.

100.  For the reasons alleged in Counts I through III, BCH's institutional negligence, negligent undertaking, negligent failure to warn and communicate risk, and gross negligence allowed the TEAMMATE-derived everolimus-conversion framework to reach Dov Fischman's

clinical care without enrollment, consent, trial monitoring, discontinuation criteria, or trial-level safeguards.

101. Plaintiff alleges that BCH's conduct was a factual and proximate cause of the chain of events that led to Dov Fischman's exposure to everolimus, immune dysfunction, PTLD, serious infection, and death.

102. Plaintiff seeks all damages recoverable under the Texas Wrongful Death Act, including loss of parental companionship, mental anguish, loss of support, medical expenses, funeral expenses, costs, interest, and all other damages permitted by law.

## XI. REQUEST FOR RELIEF

103. WHEREFORE, Plaintiff Gallit Fischman respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff on all Counts;

B. Award compensatory damages for Dov Fischman's wrongful death under the Texas Wrongful Death Act;

C. Award compensatory damages for Plaintiff's individual damages, including emotional distress and loss of parental companionship;

D. Enter a preservation order requiring BCH to retain all TEAMMATE-related records in complete, unaltered form pending resolution of this litigation;

E. Award costs of suit;

F. Award prejudgment interest as permitted by law; and

G. Grant such other relief as the Court deems just and proper within the scope of the claims asserted herein.

## JURY DEMAND

Page 29

104.   Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

Date: July 8, 2026

/s/ _Gallit Fischman_

**GALLIT FISCHMAN, Pro Se**
10114 Deermont Trail
Dallas, TX 75243
(214) 893-6720
gallitfischman@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record through the Court's CM/ECF system, or by other means authorized by the Federal Rules of Civil Procedure, on July 8, 2026.

/s/ _Gallit Fischman_

**GALLIT FISCHMAN, Pro Se**

Exhibit A — University of Texas System Letter Brief to Texas Attorney General
(August 20, 2025)

THE UNIVERSITY *of* TEXAS SYSTEM
THIRTEEN INSTITUTIONS. UNLIMITED POSSIBILITIES.

**Office of General Counsel**
210 West 7th Street
Austin, Texas 78701-2903
512-499-4462
WWW.UTSYSTEM.EDU

**Jennifer Burnett**
*Associate General Counsel & Public Information Coordinator*

August 20, 2025

Open Records Division
William B. Clements, Jr. State Office Building
300 W. 15th Street, 11th Floor
Austin, Texas 78701

**Re:    Public Information Request from Gallit Fischman to The University of Texas Southwestern Medical Center -- OGC# 222101**

On June 30, 2025, The University of Texas Southwestern Medical Center ("University") received a request for information from Gallit Fischman ("Requestor"). On July 15, 2025,[1] the University sought, in good faith, clarification of the request. *See* TEX. GOV'T CODE § 552.222(b) (governmental body may communicate with requestor to clarify or narrow request). The University received the Requestor's written response on July 16, 2025. The University sought a second clarification on July 30, 2025. The University received two written clarifications from the Requestor on August 1, 2025, and a final clarified written response on August 6, 2025.[2] The University subsequently sent the request to The University of Texas System ("UT System") for handling with your office.

In accordance with section 552.301 of the Texas Government Code, we now send this request for decision within ten business days from the date the final clarified request was received. *See City of Dallas v. Abbott*, 304 S.W. 3d. 380, 384 (Tex. 2010) (holding that when a governmental entity requests a clarification or narrowing of a request for public information in good faith, the ten-day period to request an attorney general opinion as to an exception to disclosure is measured from the date the request is clarified). The University has copied the Requestor on this letter brief in accordance with section 552.301(d).

The Requestor seeks access to the following information:

> *FINAL CLARIFIED REQUEST*
>
> *A full list of all UTSW-affiliated doctors who were involved in the TEAMMATE clinical trial, including their specific roles, as well as any UTSW doctors or*

---

[1] We note that the University was closed on July 4, 2025, for the Independence Day holiday.

[2] The final clarified response was sent after business hours via email on Tuesday, August 5, 2025, and is therefore, considered received on Wednesday, August 6, 2025, the next business day.

The University of Texas at Arlington · The University of Texas at Austin · The University of Texas at Dallas · The University of Texas at El Paso

The University of Texas of the Permian Basin · The University of Texas Rio Grande Valley · The University of Texas at San Antonio

The University of Texas at Tyler · The University of Texas Southwestern Medical Center · The University of Texas Medical Branch at Galveston

The University of Texas Health Science Center at Houston · The University of Texas Health Science Center at San Antonio

The University of Texas MD Anderson Cancer Center

> *supporting staff who were included on distribution lists that received trial status updates or performance metrics. All materials that were shared with the parents or guardians of children participating in the trial. This includes recruitment materials, informational packets, documentation on the drugs involved, ongoing communications, consent forms, and any PAP (Patient Assistance Program) forms used throughout the duration of the study.*

The University asserts the requested information, a representative sample of which is submitted herein, is protected from disclosure under sections 552.101 and 552.103 of the Texas Public Information Act ("Act").

**Section 552.101 of the Texas Government Code
in conjunction with Section 161.032 of the Health and Safety Code**

Under section 552.101 of the Texas Government Code, information is excepted from disclosure if it is "information considered to be confidential by law, either constitutionally, statutorily or by judicial decision." TEX. GOV'T CODE § 552.101. Specifically, the requested information is protected from disclosure under section 161.032 of the Health & Safety Code, which provides in pertinent part:

    (a) The records and proceedings of a medical committee are confidential and are not subject to court subpoena.
    . . .

    (c) Records, information, or reports of a medical committee, medical peer review committee, or compliance officer and records, information, or reports provided by a medical committee, medical peer review committee, or compliance officer to the governing body of a public hospital, hospital district, or hospital authority are not subject to disclosure under Chapter 552, Government Code.

TEX. HEALTH & SAFETY CODE § 161.032(a), (c). Section 161.031(b) of the Texas Health & Safety Code provides that a medical committee "includes a committee appointed ad hoc to conduct a specific investigation *or established under state or federal law* or rule or under the bylaws or rules of the organization or institution." *Id.* § 161.031(b) (emphasis added).

The information at issue consists of records prepared by, or at the direction of, Boston Children's Hospital's ("BCH") Institutional Review Board ("IRB") and provided to the University's IRB. Both IRBs are medical committees established under federal law.[3] Federal regulations define an IRB as:

---

[3] 42 U.S.C. § 289 requires the establishment of IRBs to review biomedical and behavioral research involving human subjects conducted at or supported by an entity which applies for a grant, contract, or cooperative agreement for any project or program which involves conduct of biomedical or behavioral research involving human subjects. *See* 42 U.S.C. § 289 *et seq.*

2

any board, committee, or other group formally designated by an institution to review, to approve the initiation of, and to conduct periodic review of, biomedical research involving human subjects. The primary purpose of such review is to assure the protection of the rights and welfare of the human subjects….

*See* 21 C.F.R. Sec. 56.102(g). The University's IRB is comprised of University faculty and staff and is charged with reviewing and approving research involving human subjects at the University. While BCH's IRB has primary regulatory oversight of the trial at issue,[4] the University IRB maintains these records to ensure compliance with the University IRB's own oversight responsibilities. Given the definition of IRBs under the federal regulations and the fact that IRBs are committees created pursuant to federal law, your office has routinely ruled that an IRB is a medical committee, and its records are protected from disclosure pursuant to section 161.032. *See* OR2011-05012; OR2005-00935; OR2004-3384; and OR2004-3250.

The medical committee privilege "extends to documents…prepared by or at the direction of the committee for committee purposes . . ." *Jordan v. Ct. of App. For 4th Sup. Jud. Dist.*, 701 S.W.2d 644 (Tex. 1985). The information at issue was prepared by or at the direction of the BCH's IRB and maintained by the University's IRB. Your office has previously found, on multiple occasions, UT System institutions' IRBs are medical committees for purposes of section 161.032. *See* OR2023-20276; OR2022-05656. Accordingly, the information at issue is confidential by law under section 161.032 of the Texas Health & Safety Code and is thus excepted from disclosure in conjunction with section 552.101 of the Texas Government Code.

### Section 552.103 of the Texas Government Code

In addition, the University asserts the submitted information is protected from disclosure under section 552.103 of the Texas Government Code.[5] The test for demonstrating an exception under section 552.103 requires a showing that, as of the date the request for the information was received by the governmental body: (1) litigation involving the governmental body is pending or reasonably anticipated, and (2) the information relates to the litigation. *Univ. of Tex. Law Sch. v. Tex. Legal*

---

[4] The University is relying upon BCH's IRB for the study protocol at issue pursuant to the SMART IRB Master Reliance Agreement in which both are participatory institutions.

[5] § 552.103 of the Texas Government Code provides an exception for litigation or settlement negotiations involving the state or a public subdivision and provides that:
(a) Information is excepted from the requirements of Section 552.021 if it is information relating to litigation of a civil or criminal nature to which the state or a political subdivision is or may be a party or to which an office or employee of the state or a political subdivision as a consequence of the person's office or employment, is or may be a party.
(b) For the purposes of this section, the state or political subdivision is considered to be a party to litigation of a criminal nature until the applicable statue of imitation has expired or until the defendants had exhausted all appellate and post conviction remedies in state and federal courts.
(c) Information relating to litigation involving a governmental body or an officer or employee of governmental body is excepted from disclosure under Subsection (a) only if the litigation is pending or reasonably anticipated on the date that the requestor applies to the officer for public information for access to or duplication of the information.

3

*Found.*, 958 S.W.2d 479, 481 (Tex. App—Austin 1997, no pet.); *Heard v. Houston Post Co.*, 684 S.W.2d 210, 212 (Tex. App.—Houston [1st Dist] 1984, writ ref'd n.r.e.); Open Records Decision No. 551 at 4 (1990).

The first prong of the test is satisfied. On June 30, 2025, the University received a notice letter from the Requestor alleging healthcare liability claims against the University and named employees. Such notice is required by the Texas Civil Practice and Remedies Code § 74.051 before litigation can be filed concerning a healthcare liability claim. The University received the letter prior to the date the present final clarified request was received. Based on the totality of circumstances, including the specific demand for damages and threat to file suit, the University reasonably anticipated litigation on the date of the present request. As such, the first requirement of section 552.103 is satisfied.

The second requirement of section 552.103 of the Act is also met. In the notice letter, the Requestor asserts, in part, claims arising from the administration of the prescription medication, Everolimus. This medication was studied as part of the TEAMMATE clinical trial in which University employees acted as investigators or support staff. The Requestor seeks information concerning the TEAMMATE clinical trial, including the identities of the involved University employees. The requested information is directly tied to the claims alleged against the University and the anticipated litigation. *See e.g.*, OR2003-4593. We believe that release of the responsive information at issue, in the face of the aforementioned claims to which this material is clearly relevant, could be used by the potential opposing party seeking to bolster or expand her claims against the University and interfere with the University's defense of such claims. The University has, therefore, also satisfied the second part of the test required by section 552.103 of the Act.

In short, we have shown that the University anticipated litigation in this matter by virtue of the notice of claim and demand letter, which preceded the University's receipt of the final clarified request. Additionally, the University has shown that the claims are related to the information sought by the Requestor. The University has, therefore, also satisfied the second prong of this test. The University has met its burden pursuant to section 552.103(a) and (c) of the Act. In light of these facts, the University asserts that section 552.103 excepts the responsive information at issue from disclosure.

### Conclusion

The University respectfully requests that the Attorney General review the arguments presented in this brief and issue a ruling that the information at issue is protected from disclosure as described herein.

All interested parties are listed below. If you need additional information, please do not hesitate to contact me at 512-579-5187.

Sincerely,

Jennifer Burnett

cc: Requestor: (w/o Enclosures)

      Gallit Fischman
      gallitfischman@yahoo.com

5

Exhibit B — Texas Attorney General Open Records Letter Ruling
(October 22, 2025)



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

October 22, 2025

Ms. Jennifer Burnett
Assistant General Counsel and Public Information Coordinator
The University of Texas System
210 West Seventh Street
Austin, Texas 78701

<span style="color:red">RECEIVED
October 22, 2025
Office of General Counsel
Fischman</span>

OR2025-038170

Dear Ms. Burnett:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 25-037259 (OGC# 222101).

The University of Texas Southwestern Medical Center (the "university") received a request for information pertaining to a specified clinical trial.[1] You claim the submitted information is excepted from disclosure under sections 552.101 and 552.103 of the Government Code. We have considered the exceptions you claim and reviewed the submitted representative sample of information.[2] We have also received and considered comments from the requestor. *See* Gov't Code § 552.304 (interested party may submit comments stating why information should or should not be released).

---

[1] The university states it sought and received clarifications of the information requested. *See* Gov't Code § 552.222 (providing if request for information is unclear, governmental body may ask requestor to clarify request); *see also City of Dallas v. Abbott*, 304 S.W.3d 380, 387 (Tex. 2010) (holding that when a governmental entity, acting in good faith, requests clarification or narrowing of an unclear or overbroad request for information, the ten-day period to request an attorney general ruling is measured from the date the request is clarified or narrowed).

[2] We assume the "representative sample" of records submitted to this office is truly representative of the requested records as a whole. *See* Open Records Decision Nos. 499 (1988), 497 (1988). This open records letter does not reach, and therefore does not authorize the withholding of, any other requested records to the extent those records contain substantially different types of information than that submitted to this office.

Ms. Jennifer Burnett - Page 2

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. Section 552.101 encompasses information protected by other statutes, such as section 161.032 of the Health and Safety Code, which provides in part:

> (a) The records and proceedings of a medical committee are confidential and are not subject to court subpoena.
>
> . . .
>
> (c) Records, information, or reports of a medical committee . . . and records, information, or reports provided by a medical committee . . . to the governing body of a public hospital . . . are not subject to disclosure under Chapter 552, Government Code.
>
> . . .
>
> (f) This section and Subchapter A, Chapter 160, Occupations Code, do not apply to records made or maintained in the regular course of business by a hospital, health maintenance organization, medical organization, university medical center or health science center, hospital district, hospital authority, or extended care facility.

Health & Safety Code § 161.032(a), (c), (f). A "medical committee" is any committee, including a joint committee of a hospital, medical organization, university medical school or health science center, health maintenance organization, extended care facility, a hospital district, or a hospital authority. *See id.* § 161.031(a). The term also encompasses "a committee appointed *ad hoc* to conduct a specific investigation or established under state or federal law or rule or under the bylaws or rules of the organization or institution." *Id.* § 161.031(b) (emphasis added).

The precise scope of the "medical committee" provision has been the subject of a number of judicial decisions. *See, e.g.*, *Mem'l Hosp.—The Woodlands v. McCown*, 927 S.W.2d 1 (Tex. 1996); *Barnes v. Whittington*, 751 S.W.2d 493 (Tex. 1988); *Jordan v. Fourth Supreme Judicial Dist.*, 701 S.W.2d 644 (Tex. 1986). These cases establish "documents generated by the committee in order to conduct open and thorough review" are confidential. *Mem'l Hosp.*, 927 S.W.2d at 10; *Jordan*, 701 S.W.2d at 647-48; *Doctor's Hosp. v. West*, 765 S.W.2d 812, 814 (Tex. App.—Houston [1st Dist.] 1988, no writ). This protection extends "to documents that have been prepared by or at the direction of the committee for committee purposes." *Jordan*, 701 S.W.2d at 647-48. Protection does not extend to documents "gratuitously submitted to a committee" or "created without committee impetus and purpose." *Id.*; *see also* Open Records Decision No. 591 (1991) (construing statutory predecessor to Health & Safety Code § 161.032). Additionally, we note section 161.032 does not make confidential "records made or maintained in the regular course of business by a hospital[.]" Health & Safety Code § 161.032(f); *see also Mem'l Hosp.*, 927 S.W.2d at 10 (stating reference to statutory predecessor to section 160.007 of the Occupations Code

Ms. Jennifer Burnett - Page 3

in section 161.032 is clear signal records should be accorded same treatment under both statutes in determining if they were made in ordinary course of business). The phrase "records made or maintained in the regular course of business" has been construed to mean records that are neither created nor obtained in connection with a medical committee's deliberative proceedings. *See Mem'l Hosp.*, 927 S.W.2d at 10 (discussing *Barnes*, 751 S.W.2d 493, and *Jordan*, 701 S.W.2d 644).

You assert the submitted information "consists of records prepared by, or at the direction of, Boston Children's Hospital's ("BCH") Institutional Review Board ("IRB") and provided to the [u]niversity's IRB." The university states that the IRBs are medical committees established pursuant to federal law in order "to review, to approve the initiation of, and to conduct periodic review of, biomedical research involving human subjects."[3] 21 C.F.R. § 56.102(g). The university explains that, while "BCH's IRB has primary regulatory oversight of the trial at issue, the [u]niversity IRB maintains these records to ensure compliance with the [u]niversity IRB's own oversight responsibilities." We have previously found on multiple occasions that the university's IRB is a medical committee for purposes of section 161.032. Further, based on your arguments, we find BCH's IRD is a medical committee for purposes of subchapter D of chapter 161 of the Health and Safety Code. *See* Health & Safety Code § 161.031(c); *see also Humana Hosp. Corp. v. Spears Petersen*, 867 S.W.2d 858 (Tex. App.—San Antonio 1993, no pet.) (finding Joint Commission on Accreditation of Healthcare Organizations is medical committee under section 161.031(a)(2) and its accreditation report of hospital is confidential under section 161.032). In this instance, based on your representations and our review, we agree the submitted information consists of confidential records of a medical committee under section 161.032. Therefore, we conclude the university must withhold the submitted information under section 552.101 of the Government Code in conjunction with section 161.032 of the Health and Safety Code.[4]

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open

---

[3] *See* 42 U.S.C. § 289(a) (providing that Secretary of Health and Human Services shall by regulation require that each entity which applies for grant, contract, or cooperative agreement for any project or program which involves conduct of biomedical or behavioral research involving human subjects submit in or with its application for such grant, contract, or cooperative agreement assurances satisfactory to Secretary that it has established "Institutional Review Board" to review biomedical and behavioral research involving human subjects conducted at or supported by such entity).

[4] As our ruling is dispositive, we need not address your remaining argument against disclosure of this information.

Ms. Jennifer Burnett - Page 4


Government Hotline, toll free, at (877) 673-6839.  Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

Anna Obek
Assistant Attorney General
Open Records Division

AO/mo

Ref:    ID# 25-037259

c:      Requestor

Exhibit C – Stanford Medicine TEAMMATE Clinical Trial Homepage

Case 1:26-cv-11504-WGY Document 17 Filed 07/08/26 Page 43 of 55

## TEAMMATE Clinical Trial
*A Multicenter Study*

   



 Home Page



Introduction

The TEAMMATE trial is a clinical research study led by Stanford Children's Hospital and Boston Children's Hospital, and funded by the US Department of Defense. Over 200 children and young adults at 25 hospitals around the United States will enroll in the TEAMMATE trial.

**Why are we doing the TEAMMATE trial?**

The goal of the study is to figure out which medicines to prevent heart rejection work best and have the fewest side effects. Today, the average survival after pediatric heart transplant is about 15 years, and is limited to 15 years by several common problems.

Rejection (two different types, cellular and antibody)

Infection

Coronary artery disease

Kidney disease

A form of cancer called post-transplant lymphoproliferative disease (PTLD)

Transplant Cardiologists prescribe anti-rejection medicines to children after heart transplant to keep the body's immune system from attacking the new heart and to also help minimize these common problems.  Anti-rejection medicines are used all the time after heart transplants, but no anti-rejection medication has been approved by the Food and Drug Administration (FDA) for use in children after heart transplant.

TEAMMATE will compare the effects of two combinations of anti-rejection medicines in children and young adults who have had a heart transplant. The first combination of medicines is everolimus (or Zortess®) and low-dose tacrolimus (or Prograf®).  The second combination of medicines is standard-dose tacrolimus (or Prograf®) and mycophenolate mofetil (or Cellcept®).

The primary goal of the TEAMMATE trial is to figure out which combination of medicines is better at preventing long-term problems after heart transplant.  The problems we are most concerned about are rejection, kidney problems, coronary artery disease, infection, and PTLD.

We hope that data from the TEAMMATE trial help researchers figure out which anti-rejection medicines prevent transplant complications, and lead to the first FDA approval of anti-rejection medicines in pediatric heart transplantation.

Introduction Video

To hear Dr. Rossano explain more about the TEAMMATE Trial please visit this link: TEAMMATE Trial - Introduction Video

TEAMMATE Trial - Introduction Video (Spanish)

Study Population

Children eligible for this study must be less than 21 years of age at the time of heart transplant. Children may enroll when they reach 4-7 months after heart transplantation.  Eligible children must not have any active or ongoing serious problems like rejection or infection.  More specific details about criteria for participation is available on the clinicaltrials.gov website, which you can find by clicking here.

Trial Stages

If you or your child is eligible, the study will be explained to you or your child in detail by one of the study investigators. Once your questions have been answered, you or your child will be asked to sign an informed consent form to enter the study. The study has four major parts:

**Screening**: Children eligible for this study must be less than 21 years of age at the time of heart transplant. Children may enroll when they reach 4-7 months after heart transplantation.  Eligible children must not have any active or ongoing serious problems like rejection or infection.  More specific details about criteria for participation is available on the clinicaltrials.gov website, which you or your child can find by clicking here.

**Randomization**: If eligible after screening, you or your child will be randomly assigned to receive tacrolimus and Cellcept (MMF) or tacrolimus and everolimus. The assignment is done by chance, like flipping a coin. About half of the children in this study will be assigned to receive tacrolimus and MMF; the other half will be assigned to receive tacrolimus and everolimus.

**Conversion to Tacrolimus and Everolimus**: Children who are already on tacrolimus and MMF who are assigned to tacrolimus and MMF, will continue to take the same medications.  Children who are assigned to tacrolimus and everolimus will be converted from MMF to everolimus using a standard protocol. This transition will take approximately one week.  Regardless of which drug combination you or your child is assigned, testing for several additional drug levels will be required during the first week.

**Follow up**:  You or your child will be closely monitored while on either drug regimen. During this time, the study team will assess how well you or your child is doing through physical exams, laboratory tests, medical support, questionnaires, and other tests, up until right before through the end of the study.  In general, all the study visits take place at the same time as routine post-transplant care, so additional study visits are not required.

Study Duration

You or your child's participation is 30 months, when the final study visit (of 8) will occur.

Benefits of Trial

You or your child may not receive any benefits from being in this study.

You or your child may have relatively few transplant adverse events regardless of the drug regimen you or your child is assigned to.

If you or your child is assigned to receive tacrolimus and MMF, the benefits include having you or your child receive a medical regimen that has been used in several thousand children already.  Although this regimen is not FDA-approved for heart transplant in children, it is FDA-approved for pediatric liver and kidney transplant, and adult heart transplantation.

If you or your child is assigned to tacrolimus and everolimus, the benefits may include fewer transplant complications,

and specifically it may reduce rejection, coronary artery disease, and kidney disease.  These complications are linked to reduced graft survival.  This drug regimen is also not FDA-approved for pediatric heart transplantation, but is approved for pediatric liver and kidney transplant, and is approved for adult heart transplantation in Europe.

## Possible Risks

Taking part in a research study involves risks, or side effects. You or your child should discuss these risks with you or your child's study doctor. Children eligible for this study all have a serious heart condition (heart transplant) whether or not they choose to participate in this study.

The risks of the transplant medications include infection, kidney problems, infection, diabetes, high blood pressure, and abdominal symptoms like belly pain and nausea. A complete list of the risks is provided in the informed consent form and will be explained in full by the study doctor. There may be additional risks that are not yet known. If any new risks are identified, the study doctor will share those with you.

## Patient Safety

Throughout the study, you or your child's health and safety will be monitored by the study doctor. Additionally, an independent board of scientists and medical professionals with expertise in areas such as adult and pediatric hear transplantation will regularly review study data and make recommendations to the Department of Defense regarding patient safety in this trial. Stringent safety reporting to the FDA is also required for this trial.

## Why should you be part of the TEAMMATE Trial?

TEAMMATE is the first randomized study comparing anti-rejection medications in children who have received a heart transplant.

The results of this trial will help doctors learn what drugs are the safest and best at preventing rejection in kids who have had a heart transplant.

The results from the study may lead to the **first** FDA approval of anti-rejection medications for use in kids who have had a heart transplant, which will make these medications easier to prescribe.

Participants will receive a small payment of $50 per visit to help cover out of pocket expenses (travel, meals, etc.).

Exhibit D - Relevant Excerpts from the FDA-Approved Prescribing Information for Everolimus (Zortress®), Including the Boxed Warning and Approved Indications.

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use ZORTRESS safely and effectively. See full prescribing information for ZORTRESS.

**ZORTRESS® (everolimus) tablets, for oral use**
**Initial U.S. Approval: 2010**

---

**WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**
*See full prescribing information for complete boxed warning.*

- **Only physicians experienced in immunosuppressive therapy and management of transplant patients should use Zortress (5.1)**
- **Increased susceptibility to infection and the possible development of malignancies may result from immunosuppression (5.2, 5.3)**
- **Increased incidence of kidney graft thrombosis (5.4)**
- **Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce nephrotoxicity (2.4, 2.5, 5.6, 12.7, 12.8)**
- **Increased mortality in a heart transplant clinical trial. Use in heart transplantation is not recommended (5.7)**

---

----------------------RECENT MAJOR CHANGES----------------------
Warnings and Precautions, Cannabidiol Drug Interactions (5.22)      9/2023

---

-------------------------INDICATIONS AND USAGE----------------------------
Zortress is an mTOR inhibitor immunosuppressant indicated for the prophylaxis of organ rejection in adult patients:

- Kidney Transplant: at low-moderate immunologic risk. Use in combination with basiliximab, cyclosporine (reduced doses) and corticosteroids (1.1)
- Liver Transplant: Administer no earlier than 30 days posttransplant. Use in combination with tacrolimus (reduced doses) and corticosteroids (1.2, 5.5)

Limitations of Use: Safety and efficacy have not been established in the following:
- Kidney transplant patients at high immunologic risk (1.3)
- Recipients of transplanted organs other than kidney or liver (1.3, 5.7)
- Pediatric patients (less than 18 years) (1.3)

-------------------------DOSAGE AND ADMINISTRATION--------------------
- Kidney Transplantation: starting oral dose of 0.75 mg twice daily as soon as possible after transplantation (2.1)
- Liver Transplantation: starting oral dose of 1 mg twice daily starting 30 days after transplantation (2.2)
- Monitor Everolimus Concentrations: Adjust maintenance dose to achieve trough concentrations within the 3 to 8 ng/mL target range using LC/MS/MS assay method (2.1, 2.2, 2.3)
- Administer consistently with or without food at the same time as cyclosporine or tacrolimus (2.6, 12.3)
- Mild Hepatic Impairment: Reduce initial daily dose by one-third (2.7)
- Moderate or Severe Hepatic Impairment: Reduce initial daily dose by one-half (2.7, 12.6)

----------------------DOSAGE FORMS AND STRENGTHS---------------------
Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets (3)

-------------------------------CONTRAINDICATIONS----------------------------
- Hypersensitivity to everolimus, sirolimus, or to components of the drug product (4)

--------------------------WARNINGS AND PRECAUTIONS------------------
- Angioedema [increased risk with concomitant angiotensin converting enzyme (ACE inhibitors)]: Monitor for symptoms and treat promptly (5.8)
- Delayed Wound Healing/Fluid Accumulation: Monitor symptoms; treat promptly to minimize complications (5.9)
- Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis: Monitor for symptoms or radiologic changes; manage by dose reduction or discontinuation until symptoms resolve; consider use of corticosteroids (5.10)
- Hyperlipidemia (elevations of serum cholesterol and triglycerides): Monitor and consider anti-lipid therapy (5.11)
- Proteinuria (increased risk with higher trough concentrations): Monitor urine protein (5.12)
- Polyoma Virus Infections (activation of latent viral infections; BK virus associated nephropathy): Consider reducing immunosuppression (5.13)
- TMA/TTP/HUS (concomitant use with cyclosporine may increase risk): Monitor for hematologic changes or symptoms (5.15)
- New Onset Diabetes After Transplantation: Monitor serum glucose (5.16)
- Male Infertility: Azoospermia or oligospermia may occur (5.18, 13.1)
- Immunizations: Avoid live vaccines (5.19)
- Embryo-Fetal Toxicity: Advise females of reproductive potential of the potential risk to a fetus and to use effective contraception during treatment with Zortress and for 8 weeks after final dose (5.17, 8.1, 8.3)

--------------------------------ADVERSE REACTIONS---------------------------
Most common adverse reactions were as follows:
- Kidney Transplantation (incidence greater than or equal to 20%): peripheral edema, constipation, hypertension, nausea, anemia, urinary tract infection (UTI), and hyperlipidemia (6.1)
- Liver Transplantation (incidence greater than 10%): diarrhea, headache, peripheral edema, hypertension, nausea, pyrexia, abdominal pain, leukopenia, and hypercholesterolemia (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Novartis Pharmaceuticals Corporation at 1-888-669-6682 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

--------------------------------DRUG INTERACTIONS---------------------------
Strong-moderate CYP3A4 inhibitors (e.g., cyclosporine, ketoconazole, erythromycin, verapamil) and CYP3A4 inducers (e.g., rifampin) may affect everolimus concentrations (7.1). Consider Zortress dose adjustment (5.14)

Therapeutic drug monitoring and dose reduction for Zortress should be considered when Zortress is coadministered with cannabidiol (5.22, 7.13)

--------------------------USE IN SPECIFIC POPULATIONS--------------------
- Pregnancy: Based on animal data, may cause maternal and fetal harm (8.1)
- Lactation: Breastfeeding not recommended (8.2)
- Females and Males of Reproductive Potential: May impair fertility (8.1, 8.3, 13.1)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 2/2024**

**FULL PRESCRIBING INFORMATION**

<table>
<tr><td>

**WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**

**Malignancies and Serious Infections**
- **Only physicians experienced in immunosuppressive therapy and management of transplant patients should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for maintenance therapy should have complete information requisite for the follow-up of the patient *[see Warnings and Precautions (5.1)]*.**
- **Increased susceptibility to infection and the possible development of malignancies, such as lymphoma and skin cancer, may result from immunosuppression *[see Warnings and Precautions (5.2, 5.3)]*.**

**Kidney Graft Thrombosis**
- **An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, was reported, mostly within the first 30 days posttransplantation *[see Warnings and Precautions (5.4)]*.**

**Nephrotoxicity**
- **Increased nephrotoxicity can occur with use of standard doses of cyclosporine in combination with Zortress. Therefore, reduced doses of cyclosporine should be used in combination with Zortress in order to reduce renal dysfunction. It is important to monitor the cyclosporine and everolimus whole blood trough concentrations *[see Dosage and Administration (2.4, 2.5), Warnings and Precautions (5.6), Clinical Pharmacology (12.7, 12.8)]*.**

**Mortality in Heart Transplantation**
- **Increased mortality, often associated with serious infections, within the first three months posttransplantation was observed in a clinical trial of *de novo* heart transplant patients receiving immunosuppressive regimens with or without induction therapy. Use in heart transplantation is not recommended *[see Warnings and Precautions (5.7)]*.**

</td></tr>
</table>

# 1    INDICATIONS AND USAGE

## 1.1    Prophylaxis of Organ Rejection in Kidney Transplantation

Zortress is indicated for the prophylaxis of organ rejection in adult patients at low to moderate immunologic risk receiving a kidney transplant *[see Clinical Studies (14.1)]*. Zortress is to be administered in combination with basiliximab induction and concurrently with reduced doses of cyclosporine and with corticosteroids. Therapeutic drug monitoring (TDM) of everolimus and cyclosporine is recommended for all patients receiving these products *[see Dosage and Administration (2.2, 2.3)]*.

## 1.2    Prophylaxis of Organ Rejection in Liver Transplantation

Zortress is indicated for the prophylaxis of allograft rejection in adult patients receiving a liver transplant. Zortress is to be administered no earlier than 30 days posttransplant concurrently in combination with reduced doses of tacrolimus and with corticosteroids *[see Warnings and Precautions (5.5), Clinical Studies (14.2)]*. TDM of everolimus and tacrolimus is recommended for all patients receiving these products *[see Dosage and Administration (2.3, 2.5)]*.

## 1.3    Limitations of Use

The safety and efficacy of Zortress has not been established in the following populations:

- Kidney transplant patients at high immunologic risk.
- Recipients of transplanted organs other than kidney and liver *[see Warnings and Precautions (5.7)]*.
- Pediatric patients (less than 18 years).

# 2    DOSAGE AND ADMINISTRATION

Patients receiving Zortress may require dose adjustments based on everolimus blood concentrations achieved, tolerability, individual response, change in concomitant medications and the clinical situation. Optimally, dose adjustments of Zortress should be based on trough concentrations obtained 4 or 5 days after a previous dosing change. Dose adjustment is required if the trough concentration is below 3 ng/mL. The total daily dose of Zortress should be doubled using the available tablet strengths (0.25 mg, 0.5 mg, 0.75 mg, or 1 mg). Dose adjustment is also required if the trough

concentration is greater than 8 ng/mL on 2 consecutive measures; the dose of Zortress should be decreased by 0.25 mg twice daily *[see Dosage and Administration (2.3), Clinical Pharmacology (12.3)]*.

## 2.1    Dosage in Adult Kidney Transplant Patients

An initial Zortress dose of 0.75 mg orally twice daily (1.5 mg per day) is recommended for adult kidney transplant patients in combination with reduced-dose cyclosporine, administered as soon as possible after transplantation *[see Dosage and Administration (2.3, 2.4), Clinical Studies (14.1)]*.

Oral prednisone should be initiated once oral medication is tolerated. Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

## 2.2    Dosage in Adult Liver Transplant Patients

Start Zortress at least 30 days posttransplant. An initial dose of 1 mg orally twice daily (2 mg per day) is recommended for adult liver transplant patients in combination with reduced-dose tacrolimus *[see Dosage and Administration (2.3, 2.5), Clinical Studies (14.2)]*.

Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

## 2.3    Therapeutic Drug Monitoring (TDM) - Everolimus

Routine everolimus whole blood therapeutic drug concentration monitoring is recommended for all patients. The recommended everolimus therapeutic range is 3 to 8 ng/mL *[see Clinical Pharmacology (12.7)]*. Careful attention should be made to clinical signs and symptoms, tissue biopsies, and laboratory parameters. It is important to monitor everolimus blood concentrations, in patients with hepatic impairment, during concomitant administration of CYP3A4 inducers or inhibitors or cannabidiol, when switching cyclosporine formulations and/or when cyclosporine dosing is reduced according to recommended target concentrations *[see Drug Interactions (7), Clinical Pharmacology (12.7, 12.8)]*.

There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced. There is little to no pharmacokinetic interaction of tacrolimus on everolimus, and thus, everolimus concentrations do not decrease if the tacrolimus exposure is reduced *[see Drug Interactions (7.2)]*.

The everolimus recommended therapeutic range of 3 to 8 ng/mL is based on an LC/MS/MS assay method. Currently in clinical practice, everolimus whole blood trough concentrations may be measured by chromatographic or immunoassay methodologies. Because the measured everolimus whole blood trough concentrations depend on the assay used, individual patient sample concentration values from different assays may not be interchangeable. Consideration of assay results must be made with knowledge of the specific assay used. Therefore, communication should be maintained with the laboratory performing the assay.

## 2.4    Therapeutic Drug Monitoring (TDM) - Cyclosporine in Kidney Transplant Patients

Both cyclosporine doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the risk of nephrotoxicity *[see Warnings and Precautions (5.6), Drug Interactions (7.2), Clinical Pharmacology (12.8)]*.

The recommended cyclosporine therapeutic ranges when administered with Zortress are 100 to 200 ng/mL through Month 1 posttransplant, 75 to 150 ng/mL at Months 2 and 3 posttransplant, 50 to 100 ng/mL at Month 4 posttransplant, and 25 to 50 ng/mL from Month 6 through Month 12 posttransplant. The median trough concentrations observed in the clinical trial ranged between 161 to 185 ng/mL through Month 1 posttransplant and between 111 to 140 ng/mL at Months 2 and 3 posttransplant. The median trough concentration was 99 ng/mL at Month 4 posttransplant and ranged between 46 to 75 ng/mL from Months 6 through Month 12 posttransplant *[see Clinical Pharmacology (12.8), Clinical Studies (14.1)]*.

Cyclosporine, USP Modified is to be administered as oral capsules twice daily unless cyclosporine oral solution or intravenous administration of cyclosporine cannot be avoided. Cyclosporine, USP Modified should be initiated as soon as possible, and no later than 48 hours after reperfusion of the graft and dose adjusted to target concentrations from Day 5 onwards.

If impairment of renal function is progressive, the treatment regimen should be adjusted. In renal transplant patients, the cyclosporine dose should be based on cyclosporine whole blood trough concentrations *[see Clinical Pharmacology (12.8)]*.

In renal transplantation, there are limited data regarding dosing Zortress with reduced cyclosporine trough concentrations of 25 to 50 ng/mL after 12 months. Zortress has not been evaluated in clinical trials with other formulations of cyclosporine. Prior to dose reduction of cyclosporine, it should be ascertained that steady-state everolimus whole blood trough concentration is at least 3 ng/mL. There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced *[see Drug Interactions (7.2)]*.

### 2.5    Therapeutic Drug Monitoring (TDM) – Tacrolimus in Liver Transplant Patients

Both tacrolimus doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the potential risk of nephrotoxicity *[see Warnings and Precautions (5.6), Clinical Pharmacology (12.9)]*.

The recommended tacrolimus therapeutic range when administered with Zortress are whole blood trough ($C_{0h}$) concentrations of 3 to 5 ng/mL by three weeks after the first dose of Zortress (approximately Month 2) and through Month 12 posttransplant.

The median tacrolimus trough concentrations observed in the clinical trial ranged between 8.6 to 9.5 ng/mL at Weeks 2 and 4 posttransplant (prior to initiation of everolimus). The median tacrolimus trough concentrations ranged between 7 to 8.1 ng/mL at Weeks 5 and 6 posttransplant, between 5.2 to 5.6 ng/mL at Months 2 and 3 posttransplant, and between 4.3 to 4.9 ng/mL between Months 4 and 12 posttransplant *[see Clinical Pharmacology (12.9), Clinical Studies (14.2)]*.

Tacrolimus is to be administered as oral capsules twice daily unless intravenous administration of tacrolimus cannot be avoided.

In liver transplant patients, the tacrolimus dose should be based on tacrolimus whole blood trough concentrations *[see Clinical Pharmacology (12.9)]*.

In liver transplantation, there are limited data regarding dosing Zortress with reduced tacrolimus trough concentrations of 3 to 5 ng/mL after 12 months. Prior to dose reduction of tacrolimus, it should be ascertained that the steady-state everolimus whole blood trough concentration is at least 3 ng/mL. Unlike the interaction between cyclosporine and everolimus, tacrolimus does not affect everolimus trough concentrations, and consequently, everolimus concentrations do not decrease if the tacrolimus exposure is reduced.

### 2.6    Administration

Zortress tablets should be swallowed whole with a glass of water and not crushed before use.

Administer Zortress consistently approximately 12 hours apart with or without food to minimize variability in absorption and at the same time as cyclosporine or tacrolimus *[see Clinical Pharmacology (12.3)]*.

### 2.7    Hepatic Impairment

Whole blood trough concentrations of everolimus should be closely monitored in patients with impaired hepatic function. For patients with mild hepatic impairment (Child-Pugh Class A), the initial daily dose should be reduced by approximately one-third of the normally recommended daily dose. For patients with moderate or severe hepatic impairment (Child-Pugh Class B or C), the initial daily dose should be reduced to approximately one-half of the normally recommended daily dose. Further dose adjustment and/or dose titration should be made if a patient's whole blood trough concentration of everolimus, as measured by an LC/MS/MS assay, is not within the target trough concentration range of 3 to 8 ng/mL *[see Clinical Pharmacology (12.6)]*.

### 3    DOSAGE FORMS AND STRENGTHS

Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets.

**Table 1. Description of Zortress (everolimus) Tablets**

| Dosage strength | 0.25 mg | 0.5 mg | 0.75 mg | 1 mg |
|---|---|---|---|---|
| Appearance | White to yellowish, marbled, round, flat tablets with beveled edge | | | |
| Imprint | "C" on one side and "NVR" on the other | "CH" on one side and "NVR" on the other | "CL" on one side and "NVR" on the other | "CU" on one side and "NVR" on the other |

## 4    CONTRAINDICATIONS

### 4.1    Hypersensitivity Reactions

Zortress is contraindicated in patients with known hypersensitivity to everolimus, sirolimus, or to components of the drug product.

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Management of Immunosuppression

Only physicians experienced in management of systemic immunosuppressant therapy in transplantation should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for the maintenance therapy should have complete information requisite for the follow-up of the patient. In limited data with the complete elimination of calcineurin inhibition (CNI), there was an increased risk of acute rejection.

### 5.2    Lymphomas and Other Malignancies

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing lymphomas and other malignancies, particularly of the skin. The risk appears to be related to the intensity and duration of immunosuppression rather than to the use of any specific agent.

As usual for patients with increased risk for skin cancer, exposure to sunlight and ultraviolet light should be limited by wearing protective clothing and using a sunscreen with a high protection factor.

### 5.3    Serious Infections

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing bacterial, viral, fungal, and protozoal infections, including opportunistic infections *[see Warnings and Precautions (5.13), Adverse Reactions (6.1, 6.2)]*. These infections may lead to serious, including fatal, outcomes. Because of the danger of over-immunosuppression, which can cause increased susceptibility to infection, combination immunosuppressant therapy should be used with caution.

Antimicrobial prophylaxis for *Pneumocystis jiroveci* (*carinii*) pneumonia and prophylaxis for cytomegalovirus (CMV) is recommended in transplant recipients.

### 5.4    Kidney Graft Thrombosis

An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, has been reported, usually within the first 30 days posttransplantation *[see Boxed Warning]*.

### 5.5    Hepatic Artery Thrombosis

Mammalian target of rapamycin (mTOR) inhibitors are associated with an increase in hepatic artery thrombosis (HAT). Reported cases mostly have occurred within the first 30 days posttransplant and most also lead to graft loss or death. Therefore, Zortress should not be administered earlier than 30 days after liver transplant.

### 5.6    Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity

In kidney transplant recipients, Zortress with standard dose cyclosporine increases the risk of nephrotoxicity resulting in a lower glomerular filtration rate. Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce renal dysfunction *[see Boxed Warning, Indications and Usage (1.1), Clinical Pharmacology (12.8)]*.

In liver transplant recipients, Zortress has not been studied with standard dose tacrolimus. Reduced doses of tacrolimus should be used in combination with Zortress in order to minimize the potential risk of nephrotoxicity *[see Indications and Usage (1.2), Clinical Pharmacology (12.9)]*.

Renal function should be monitored during the administration of Zortress. Consider switching to other immunosuppressive therapies if renal function does not improve after dose adjustments or if the dysfunction is thought to be drug related. Caution should be exercised when using other drugs which are known to impair renal function.

### 5.7    Heart Transplantation

In a clinical trial of *de novo* heart transplant patients, Zortress in an immunosuppressive regimen, with or without induction therapy, resulted in an increased mortality often associated with serious infections within the first three months posttransplantation compared to the control regimen. Use of Zortress in heart transplantation is not recommended.

### 5.8    Angioedema

Zortress has been associated with the development of angioedema. The concomitant use of Zortress with other drugs known to cause angioedema, such as angiotensin converting enzyme (ACE) inhibitors may increase the risk of developing angioedema.

### 5.9    Wound Healing and Fluid Accumulation

Zortress increases the risk of delayed wound healing and increases the occurrence of wound-related complications like wound dehiscence, wound infection, incisional hernia, lymphocele and seroma. These wound-related complications may require more surgical intervention. Generalized fluid accumulation, including peripheral edema (e.g., lymphoedema) and other types of localized fluid collection, such as pericardial and pleural effusions and ascites have also been reported.

### 5.10    Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis

A diagnosis of interstitial lung disease (ILD) should be considered in patients presenting with symptoms consistent with infectious pneumonia but not responding to antibiotic therapy and in whom infectious, neoplastic and other non-drug causes have been ruled out through appropriate investigations. Cases of ILD, implying lung intraparenchymal inflammation (pneumonitis) and/or fibrosis of non-infectious etiology, some reported with pulmonary hypertension [including pulmonary arterial hypertension (PAH)] as a secondary event, have occurred in patients receiving rapamycins and their derivatives, including Zortress. Most cases generally resolve on drug interruption with or without glucocorticoid therapy. However, fatal cases have also occurred.

### 5.11    Hyperlipidemia

Increased serum cholesterol and triglycerides, requiring the need for anti-lipid therapy, have been reported to occur following initiation of Zortress and the risk of hyperlipidemia is increased with higher everolimus whole blood trough concentrations *[see Adverse Reactions (6.2)]*. Use of anti-lipid therapy may not normalize lipid levels in patients receiving Zortress.

Any patient who is administered Zortress should be monitored for hyperlipidemia. If detected, interventions, such as diet, exercise, and lipid-lowering agents should be initiated as outlined by the National Cholesterol Education Program guidelines. The risk/benefit should be considered in patients with established hyperlipidemia before initiating an immunosuppressive regimen containing Zortress. Similarly, the risk/benefit of continued Zortress therapy should be reevaluated in patients with severe refractory hyperlipidemia. Zortress has not been studied in patients with baseline cholesterol levels greater than 350 mg/dL.

Due to an interaction with cyclosporine, clinical trials of Zortress and cyclosporine in kidney transplant patients strongly discouraged patients from receiving the HMG-CoA reductase inhibitors simvastatin and lovastatin. During Zortress therapy with cyclosporine, patients administered an HMG-CoA reductase inhibitor and/or fibrate should be monitored for the possible development of rhabdomyolysis and other adverse effects, as described in the respective labeling for these agents *[see Drug Interactions (7.7)]*.

### 5.12    Proteinuria

The use of Zortress in transplant patients has been associated with increased proteinuria. The risk of proteinuria increased with higher everolimus whole blood trough concentrations. Patients receiving Zortress should be monitored for proteinuria *[see Adverse Reactions (6.2)]*.

### 5.13    Polyoma Virus Infections

Patients receiving immunosuppressants, including Zortress, are at increased risk for opportunistic infections, including polyoma virus infections. Polyoma virus infections in transplant patients may have serious, and sometimes fatal, outcomes. These include polyoma virus-associated nephropathy (PVAN), mostly due to BK virus infection, and JC virus associated progressive multiple leukoencephalopathy (PML). PVAN has been observed in patients receiving immunosuppressants, including Zortress. PVAN is associated with serious outcomes; including deteriorating renal function and kidney graft loss *[see Adverse Reactions (6.2)]*. Patient monitoring may help detect patients at risk for PVAN. Reductions in immunosuppression should be considered for patients who develop evidence of PVAN or PML. Physicians should also consider the risk that reduced immunosuppression represents to the functioning allograft.

### 5.14    Interaction With Strong Inhibitors and Inducers of CYP3A4

Coadministration of Zortress with strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, voriconazole, clarithromycin, telithromycin, ritonavir, boceprevir, telaprevir) or strong CYP3A4 inducers (e.g., rifampin, rifabutin) is not recommended without close monitoring of everolimus whole blood trough concentrations *[see Drug Interactions (7)]*.

### 5.15    Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome

The concomitant use of Zortress with cyclosporine may increase the risk of thrombotic microangiopathy (TMA)/thrombotic thrombocytopenic purpura (TTP)/hemolytic uremic syndrome (HUS). Monitor hematologic parameters *[see Adverse Reactions (6.2)]*.

### 5.16    New Onset Diabetes After Transplant

Zortress has been shown to increase the risk of new onset diabetes mellitus after transplant. Blood glucose concentrations should be monitored closely in patients using Zortress.

### 5.17    Embryo-Fetal Toxicity

Based on animal studies and the mechanism of action *[see Clinical Pharmacology (12.1)]*, Zortress may cause fetal harm when administered to a pregnant woman. In animal studies, everolimus caused embryo-fetal toxicity when administered during the period of organogenesis at maternal exposures that were equal to or less than human exposures at the recommended lowest starting dose. Advise pregnant women of the potential risk to a fetus. Advise female patients of reproductive potential to avoid becoming pregnant and to use effective contraception while using Zortress and for 8 weeks after ending treatment *[see Use in Specific Populations (8.1, 8.3)]*.

### 5.18    Male Infertility

Azoospermia or oligospermia may be observed *[see Adverse Reactions (6.2), Nonclinical Toxicology (13.1)]*. Zortress is an anti-proliferative drug and affects rapidly dividing cells like the germ cells.

### 5.19    Immunizations

The use of live vaccines should be avoided during treatment with Zortress; examples include (not limited to) the following: intranasal influenza, measles, mumps, rubella, oral polio, BCG, yellow fever, varicella, and TY21a typhoid vaccines.

### 5.20    Interaction With Grapefruit Juice

Grapefruit and grapefruit juice inhibit cytochrome P450 3A4 and P-gp activity and should therefore be avoided with concomitant use of Zortress and cyclosporine or tacrolimus.

### 5.21    Patients With Hereditary Disorders/Other

Patients with rare hereditary problems of galactose intolerance, the Lapp lactase deficiency or glucose-galactose malabsorption should not take Zortress as this may result in diarrhea and malabsorption.

### 5.22    Cannabidiol Drug Interactions

When cannabidiol and Zortress are coadministered, closely monitor for an increase in everolimus blood levels and for adverse reactions suggestive of everolimus toxicity. A dose reduction of Zortress should be considered as needed when Zortress is coadministered with cannabidiol *[see Dosage and Administration (2.3), Drug Interactions (7.13)]*.

**6        ADVERSE REACTIONS**

**6.1        Serious and Otherwise Important Adverse Reactions**

The following adverse reactions are discussed in greater detail in other sections of the label.
- Hypersensitivity Reactions *[see Contraindications (4.1)]*
- Lymphomas and Other Malignancies *[see Boxed Warning, Warnings and Precautions (5.2)]*
- Serious Infections *[see Warnings and Precautions (5.3)]*
- Kidney Graft Thrombosis *[see Warnings and Precautions (5.4)]*
- Hepatic Artery Thrombosis *[see Warnings and Precautions (5.5)]*
- Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity *[see Warnings and Precautions (5.6)]*
- Heart Transplantation *[see Warnings and Precautions (5.7)]*
- Angioedema *[see Warnings and Precautions (5.8)]*
- Wound Healing and Fluid Accumulation *[see Warnings and Precautions (5.9)]*
- Interstitial Lung Disease/Non-Infectious Pneumonitis *[see Warnings and Precautions (5.10)]*
- Hyperlipidemia *[see Warnings and Precautions (5.11)]*
- Proteinuria *[see Warnings and Precautions (5.12)]*
- Polyoma Virus Infections *[see Warnings and Precautions (5.13)]*
- Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome (TMA/TTP/HUS) *[see Warnings and Precautions (5.15)]*
- New Onset Diabetes After Transplant *[see Warnings and Precautions (5.16)]*
- Male Infertility *[see Warnings and Precautions (5.18)]*

**6.2        Clinical Trials Experience**

Because clinical trials are conducted under widely varying conditions, the adverse reaction rates observed cannot be directly compared to rates in other trials and may not reflect the rates observed in clinical practice.

Kidney Transplantation

The data described below reflect exposure to Zortress in an open-label, randomized trial of *de novo* kidney transplant patients of concentration-controlled everolimus at an initial Zortress starting dose of 1.5 mg per day [target trough concentrations 3 to 8 ng/mL with reduced exposure cyclosporine (N = 274) compared to mycophenolic acid (N = 273) with standard exposure cyclosporine]. All patients received basiliximab induction therapy and corticosteroids. The population was between 18 and 70 years, more than 43% were 50 years of age or older (mean age was 46 years in the Zortress group, 47 years control group); a majority of recipients were male (64% in the Zortress group, 69% control group); and a majority of patients were Caucasian (70% in the Zortress group, 69% control group). Demographic characteristics were comparable between treatment groups. The most frequent diseases leading to transplantation were balanced between groups and included hypertension/nephrosclerosis, glomerulonephritis/glomerular disease and diabetes mellitus. Significantly more patients discontinued Zortress 1.5 mg per day treatment (83/277, 30%) than discontinued the control regimen (60/277, 22%). Of those patients who prematurely discontinued treatment, most discontinuations were due to adverse reactions: 18% in the Zortress group compared to 9% in the control group (p-value = 0.004). This difference was more prominent between treatment groups among female patients. In those patients discontinuing study medication, adverse reactions were collected up to 7 days after study medication discontinuation and serious adverse reactions up to 30 days after study medication discontinuation.

Discontinuation of Zortress at a higher dose (3 mg per day) was 95/279, 34%, including 20% due to adverse reactions, and this regimen is not recommended (see below).

The overall incidences of serious adverse reactions were 57% (159/278) in the Zortress group and 52% (141/273) in the mycophenolic acid group. Infections and infestations reported as serious adverse reactions had the highest incidence in both groups [20% (54/274) in the Zortress group and 25% (69/273) in the control group]. The difference was mainly due to the higher incidence of viral infections in the mycophenolic acid group, mainly CMV and BK virus infections. Injury, poisoning and procedural complications reported as serious adverse reactions had the second highest incidence in both groups [14% (39/274) in the Zortress group and 12% (32/273) in the control group] followed by renal and urinary disorders [10% (28/274) in the Zortress group and 13% (36/273) in the control group] and vascular disorders [10% (26/274) in the Zortress group and 7% (20/273) in the control group].